## No. 2546.

### ALBERT JOHNSON v. THE STATE.

1. PRACTICE—CONFESSION—CROSS EXAMINATION OF A WITNESS.—The proof on a trial for rape was in direct conflict as to the identity of the defendant as the person who committed the offense. A defense witness having testified to facts tending to establish in favor of the defendant a case of mistaken identity, the State, over objection of defendant, was permitted to interrogate the witness as to whether or not, subsequent to the alleged offense, he received from the defendant a letter confessing his guilt, and making a statement concerning, and asking information about, the commission of the offense. In permitting this manner of examination the court erred, because, first, if, as manifest, the purpose of the State was to prove that the witness received from defendant a letter written by him and confessing his guilt, it should first have summoned the witness with a *subpœna duces tecum* to produce the letter in court. Failing then to produce the letter, the witness might be examined to prove the reception by him of such a letter, and that to his knowledge it was written by defendant. But then the contents of the letter could not be proved by the witness without proof of the loss or destruction of the same. Second, if the object of the State was to impeach the witness, then the fact whether or not he had received

a letter from the defendant was the only fact about which the predicate was allowable, and, the witness having answered that question in the negative, the limit of the investigation was reached, under the rule that "when a witness is cross examined on a matter collateral to the issue, his answer can not be subsequently contradicted by the party putting the question." This rule was further violated in this case by permitting the State to contradict the witness by another witness, as to the letter.

2. RAPE—CHARGE OF THE COURT.—The trial court charged the jury as follows: "Penetration is necessary to constitute the offense, but penetration only is necessary to constitute the offense." *Held*, abstractly correct, but insufficient, because, in addition to penetration, it is essential in a rape case to show want of the woman's consent, and that the act was accomplished by force, threats or fraud.

3. SAME—REASONABLE DOUBT.—The court charged further as follows: "It is not sufficient, to secure a conviction, for the State to make out a prima facie case, but the guilt of the defendant must be shown beyond a reasonable doubt; and the failure or inability of the defendant to show his innocence does not lend any additional probative force to the incriminative facts, if any, shown by the State, or raise any presumption of guilt against the defendant." This charge, though abstractly correct, was calculated to lead the jury to believe that, in the opinion of the court, the defense had failed to show innocence. A reasonable doubt of guilt, independent of exculpatory proof, entitles an accused to an acquittal.

4. SAME.—The court further instructed the jury that "the defendant is presumed to be innocent until his guilt is proved beyond a reasonable doubt; and, if upon the whole evidence you have a reasonable doubt of his guilt, you must acquit him, and not resolve the doubt by a mitigation of the punishment." This charge is objectionable in that the concluding clause may have induced the jury to inflict the greater penalty instead of the milder one provided by the statutes. Note the suggestion that in charging the reasonable doubt the trial court should follow the language of the statute. (Penal Code, art. 727.)

APPEAL from the District Court of Washington. Tried below before the Hon. I. B. McFarland.

This is the second appeal prosecuted by this appellant from conviction for the rape of Annie Knuppel, on the twenty-sixth day of January, 1886. The penalty assessed on this last trial was death.

The testimony adduced on the two trials was substantially the same, and for the purposes of this Report it is deemed sufficient to state, in succinct form, the substance of the proof upon the one contested issue of fact, which involved the identity of the accused, and to refer to the former report of this case for

the evidence in detail. (See Johnson v. The State, 21 Texas Ct. App., 368.)

The testimony of Miss Knuppel, the injured party, was the only proof in the case identifying the defendant as the party who committed the outrage, and upon this issue her evidence was direct and positive, except that, when recalled to the stand by the defense, she admitted that if the defendant on trial had a mustache at the time of the rape, then he was not the person who committed it. In substance, Miss Knuppel's narrative is as follows:

The outrage was committed on Tuesday, January 26, 1886, at about one, or half past one o'clock in the day. The place was on the line of the Gulf, Colorado & Santa Fe Railway, about a mile and a half or two miles south of Brenham, near where the public road leading from Brenham to Wesley crosses the railroad track. She was living with her father about four miles south of Brenham, and at the time of the assault was returning home from town, to which she had gone on an errand. She had ridden to town on a wagon with Messrs. Kraemer and Roemer, but returned home on foot, walking along the railroad track. At about a mile and a half or two miles from town she was overtaken by a colored man, who was walking in the same direction with herself but more rapidly. When she first saw him he was about twenty feet behind her. As he got near her she stepped off the track to let him go by. He passed her, and then turned and caught hold of her and struck her with his hand. He then threw her down and had carnal intercourse with her against her will. The man then left her and came back in the direction of Brenham, and she saw him no more. On reaching home she told her mother and sister-in-law, and afterwards her father and others, of the occurrence, describing to them the person of her assailant and the circumstances of the outrage.

According to her statement there was no peculiarity about the man. "He was a middle sized man; he wasn't right black or right yellow, but midway between, and was what is called in German a ' younge,' or young man. He looked to be about twenty years of age, but might have been any where from nineteen or twenty to twenty-five years old; he had no beard or whiskers and no mustache, but had a perfectly smooth face, as smooth as her own. He had a scar on the right side of his face, near the eye. She looked at him well while he had her

down, and observed the scar on his face then and afterwards. He had on a dark gray coat, dark pants and a gray hat." A black frock coat, Prince Albert style, and a small, stiff, black Derby hat, claimed by the defendant, were exhibited to her, but she said they were wholly different from those worn by her assailant. The coat worn by the party who ravished her was a short sack coat of a gray color; the hat was a soft "slouch" hat, also gray in color. The man remained with her about five or ten minutes. When he overtook her he had a piece of iron in his hand, a fish bar plate, about twelve or fourteen inches long and not quite so wide as her hand. While he had her down he had a rock in his hand. He picked up the rock and then dropped the iron. She could not remember whether he dropped the iron and rock after he got up or not. She had never seen her assailant before. Two colored men, Willie Wills and Anderson Guyton, were arrested and brought before her by the officers shortly after the outrage, both of whom had scars on their faces and otherwise corresponded with the description given by her of her assailant, but she said neither of them was the man who outraged her. She said Willie Wills "had a scar on the right side of his face, near the eye," but he was "not of the right color." She "did not know whether he was lighter or blacker" than her assailant. She "did not know whether he was taller or not." She "did not know whether he was as old or not;" he was "about fifteen or twenty years old;" he was "a middle sized man;" she could not tell whether or not he was taller than the defendant, nor which was the blacker of the two. She has not seen Willie Wills in two years. When they brought Anderson Guyton for her to look at she saw at once that he was not the right man. He was "too small," was smaller than her assailant. She did not think Guyton got off his horse. She did not know whether he had a scar on his face or not.

The defendant was taken as a prisoner to her father's house about the middle of March, 1886, seven or eight weeks after the alleged outrage, when she promptly recognized him as her ravisher, although he was differently dressed and then had a mustache, but "not much of a one." She recognized him "by his whole face;" "by his general appearance," and by "the scar." She "would have known him any way, without the scar." She was positive in her statement that the defendant was the man who outraged her, but, except in the particulars

named, she did not describe or distinguish him from other persons of his race and color. She did not undertake to give any other peculiarity of form or feature, or to state or approximate his height or weight. With the defendant sitting before her at the trial, she described the scar as being "on the right temple, a little to the right of the eye," and said "it curved up in a circle, the middle part going upwards." With reference to his age, she then said he was "from twenty to twenty-seven years of age;" "not twenty, but between twenty and twenty-seven."

She stated that the suspected parties were not all brought before her at the same time, but separately, and when the defendant was brought to her for identification she was apprised of the purpose of his being brought, and no test whatever was made to ascertain whether she would be able to single him out of a crowd.

She thus describes the scene of the outrage: "It was on the Santa Fe railway track about a mile and a half or two miles south of Brenham, and about two hundred yards north of where the public road leading from Wesley to Brenham crosses the railroad track. "It was not in a cut," but the embankment was "two or three feet high." She "could see over it." Two rent houses were in plain view, not more than three hundred and fifty or four hundred yards distant. The parties were also in plain view of persons traveling the Wesley road and of any one passing on the railway. Her assailant laid her down between the banks of the railway on the right hand side of the track, but off of the track; her feet were pointing towards the track, her head was angling north. The alleged outrage took place shortly after noon, at about one or half after one o'clock.

When recalled by the defendant she stated again, in the most positive language, that the party who had assaulted her had no beard whatever on his face—neither whisker nor mustache. "If this man," she said, "had a mutache on the twenty-sixth of January, 1886, then he is not the man that ravished me." On further examination by the State she reaffirmed her conviction that the defendant was the guilty party. "I have no doubt whatever," she said, "about his being the man."

The remaining testimony for the State, as may be seen by reference to the previous report, clearly establishes the penetration of the girl's private parts, and otherwise supports her narrative except as to the identity of the offending party, with respect to which it is not directed. It is not, however,

essential to the question of evidence involved in the disposi-
tion of this appeal, and, therefore, is not here recapitulated.
It may be stated, however, that no witness, testifying for the
State, claimed to have seen the defendant in the vicinity of
Brenham, or the scene of the outrage, at any time near the
day of the alleged outrage, or to have known him at any time
when he answered, in appearance or dress, to the description
given by Miss Knuppel of her assailant. It was shown that
defendant was arrested in Austin county, seven or eight weeks
after the alleged outrage.

The defense relied upon was an alibi and mistaken identity—
that he was not the person who committed the offense. To
support the first of these defenses he proved by the persons
with whom he was living and working—six different parties—
that he was at his work, some three or four miles from the
place of the alleged offense, on the day of its occurrence and
during that entire week. During his stay in the neighborhood,
which lasted about five weeks—from the beginning of January
to February 6—he came to Brenham but twice—once, about
the middle of January, to meet his wife and take her to his
sister's, with whom he was boarding; the other time a few days
later, when he accompanied his wife as far as Brenham on her
return to Bellville. On both of these occasions he rode a mule
belonging to Ford, and led the horse which had been ridden by
his wife. The witness, Willis Jackson, taught school on the
road traveled by the defendant and Ford and his wife in going
to and from their work. On Monday, January 25, the day be-
fore the alleged outrage, the defendant came to the school
house and inquired of witness when he expected to go to Bren-
ham, and, learning that he would go on Wednesday, the twen-
ty-seventh, which was witness's lodge night, defendant re-
quested him to call for his mail, which witness did, waking
him up to deliver it on Wednesday night, the day following
the commission of the alleged offense.

Upon the remaining defense—that he was not the person
who committed the outrage—the defendant proved by the six
witnesses by whom he sought to establish an alibi, and by
fifteen others living in and about Bellville—some white and
some black—including the sheriff, the county attorney and the
judge and ex-judge of the county court, that they had known
him for periods ranging from five to fifteen years, and that he
had worn a mustache for several years continuously up to the

time of this trial. The same witnesses testified that they had never seen the defendant dressed in clothing similar to that which, according to the testimony of Miss Knuppel, was worn by her assailant.

The principal ruling upon this appeal is based upon the action of the trial court with respect to the examination of the defendant's witness Robert Ford. The said Ford was one of the six parties who, being introduced by the defendant, testified to the facts constituting the alibi relied upon, and also to the fact that the defendant had a mustache at the time of the alleged outrage, and that he owned no such clothes as those described by Miss Knuppel. The method of cross examination to which the ruling of this court is particularly directed appears fully in the opinion.

In rebuttal of this witness, the State introduced the witness Wash Boulding, Jr., to whom it propounded questions and elicited answers as follows:

Question. "Did you or not, shortly after the rape upon Annie Knuppel, in the city of Brenham, between Lehman's bar room and Julia McFarland's book store, at the request of Robert Ford, a brother-in-law of the defendant, read a letter directed to said Ford?"

Answer. "I did, shortly after the rape, read a letter for Robert Ford at the place mentioned, said letter being to him."

Q. "State whether or not said letter was, or purported to be, from the defendant, and made any statement about the said rape, and inquired of said Ford who was suspected of its commission, and if defendant was accused of it."

To which question and any answer thereto the defendant, by his counsel, objected, which objection the court sustained and refused to allow said witness to answer the same; whereupon the State's counsel inquired of said witness:

Q. "Do you know the defendant's hand writing, and was said letter in his hand writing?"

A. "I do not know whether it was in defendant's hand writing or not. I do not know defendant's hand writing."

Q. "Don't tell what was in the letter, or who it was from, but state who was present at the time you read the letter to Ford. And how did you happen to read the letter? Was it before or after defendant's arrest? Was the letter directed to Ford."

A. "I read the letter for Ford before defendant was arrested

on this charge. Ed Deadman and Willis Boulding were pres-ent at the time. I was standing on the sidewalk, at Lehman's bar room, with Ed Deadman and Willis Boulding. Robert Ford came up to us and asked me to read the letter for him, as he could not read. We stepped off the sidewalk into the street a little way, between Lehman's bar room and McFarland's book store, and I read the letter to Ford. It was directed to him."

*B. H. Bassett* and *E. B. Muse*, for the appellant: We insist that the court erred in admitting, over defendant's objections, the testimony elicited from the witness Robert Ford with refer-ence to an alleged letter written by the defendant; because, 1. The letter (if such ever existed) was the best evidence. No effort having been shown by the State to procure or produce such letter upon the trial or prove its loss, the testimony was secondary. 2. The testimony was inadmissible, because the execution of the letter in defendant's handwriting had not been shown, and no promise upon the part of the State was made to show such fact. 3. Said testimony was illegal and irrelevant to the issue of defendant's guilt, and was prejudicial to the de-fendant.

The court erred in admitting the testimony of Boulding; be-cause:

1. The alleged letter was not shown to have been written by defendant, or by his direction, or to have been in his hand-writing.

2. Because no basis for an impeachment of the witness Ford had been laid by the State; no specified time, place or circum-stance having been stated.

3. Because the letter read (if any), not being shown to have been from the defendant, the impeachment of the witness Ford by Boulding was upon an immaterial issue in the case, the same not tending to establish the guilt of the defendant by legal evidence.

4. Because it did not appear that the defendant had in fact written any letter to Ford, or that Ford had received such, or that Boulding had read such a letter from the defendant.

5. Because the testimony was illegal and irrelevant, and be-cause the tendency, if not the purpose of the testimony and ex-amination in connection with the testimony of the witness Ford, hereinbefore excepted to, was to impress the jury with the idea

or belief that the defendant had written a letter to Ford confessing or tending to show his guilt.

6. Because said testimony was calculated to prejudice the jury against the defendant, and tended to create in the minds of the jury a belief of defendant's guilt. But the court overruled said objections and admitted said testimony to the jury, to which decision of the court the defendant then excepted; and thereafter the defendant moved the court to strike out all of said questions and answers and testimony of said witness Boulding, and to instruct the jury to disregard the same, which was refused, and the defendant duly excepted to said rulings.

The charge did not in any way restrict the effect of the testimony.

It is submitted: 1. That the jury would readily connect the excluded letter, in relation to which Boulding spoke, with that concerning which Ford had been interrogated, and would naturally infer that Boulding had seen and read a letter from the defendant to Ford containing a substantial confession of his guilt; which would, in the language of the Supreme Court, in The City of Galveston v. Barbour, 62 Texas, 175, be but another mode of bringing before the jury parol evidence of the contents of the letter.

2. The admission of the evidence constitutes reversible error, the evidence having been admitted over objection, and its probable influence being prejudicial. (Malcomson's Case, 25 Texas Ct. App., 268, 291.)

3. That the attempted impeachment should have been restricted to the exact predicate laid; and that neither time, place nor circumstance being laid in the predicate, the impeaching evidence was improperly admitted. (Henderson's Case, 1 Texas Ct. App., 432; Treadway's Case, Id., 668; Williams's Case, 3 Texas Ct. App., 316; Walker's Case, 6 Texas Ct. App., 577.)

4. That the attempted impeachment was on a wholly irrelevant and immaterial fact, the alleged letter not being shown to have been written or sent by the defendant, and no *subpœna duces tecum* or other effort being taken to secure the production of the letter itself. (Estep's Case, 9 Texas Ct. App., 336; Walker's Case, 6 Texas Ct. App., 577; Rainey's Case, 20 Texas Ct. App., 473; 1 Greenl. Ev., secs. 560, 562, 575, 577.)

5. And even should it be held that the evidence was properly admitted for purposes of impeachment, the charge should have restricted its use to that specific purpose. (Maines's Case, 23

Texas Ct. App., 568, 572; Washington's Case, Id., 336, 338; Barron's Case, Id., 462, 475; Davidson's Case, 22 Texas Ct. App., 373, 382; Taylor's Case, Id., 530, 545; Rogers's Case, 9 S. W. Rep., 763, 768.)

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant's record now before us presents a second appeal taken by him in this case. He has twice been convicted of rape—his punishment the first time being assessed at imprisonment in the penitentiary for ninety-nine years, and on the second trial, from which this appeal is taken, there is an assessment of the death penalty as his punishment. (Johnson v. The State, 21 Texas Ct. App., 368.)

In the view we take of the present record, and of the duty devolving upon us as to the disposition to be made by us of the case here presented, it is unnecessary, and would perhaps be profitless to notice the questions arising upon the rulings of the court in relation to matters occurring preliminary to the trial upon the merits; since it is not probable that they will again arise upon another trial.

One of the most important issues which arose upon the trial in the court below was as to the identity of the defendant as the party who had committed the crime. Whilst the prosecutrix had sworn positively to the identity of the defendant as the man who ravished her, she said, nevertheless as positively that "if this man (defendant) had a mustache on the twenty-sixth day of January, 1886 (the day she was ravished), then he is not the man that ravished me." On this issue, thus squarely made, defendant had produced a number of witnesses, white as well as black, and some of them men of prominence, whose testimony was almost positive to the fact that defendant did wear a mustache on the twenty-sixth of January, 1886. And the same may be said with reference to the difference in the clothing worn by the ravisher and that worn by defendant. In other words in short, the effort of the defendant was to meet every part and portion of the testimony of the prosecutrix descriptive of the identity of the party who outraged her, and to show that it was a case of mistaken identity with her, and that it was impossible he could have been the guilty party.

In this attitude of the case, the State, over objections of defendant, was permitted to cross examine the defendant's witness Robert Ford as follows, viz.:

Question by the State: "Did you not, after the rape of Annie Knuppel, receive a letter from the defendant inquiring of you about the commission of said rape, who was suspected of it, and if he was accused of its commission?"

Answer: "I never, at any time, received a letter from the defendant, after or before said alleged rape, nor did I receive any letter from him inquiring of its commission or asking if he was accused of it."

Q. "Did you not, after said rape, receive a letter purporting to come from defendant, making a statement about the rape, or inquiring if defendant was accused of it?"

A. "I never received any letter from defendant, or from any one else, or purporting to come from defendant, making a statement about the rape, or inquiring if defendant was accused of it. I do not read or write. I do not know defendant's hand writing."

Q. "Did you not, in Brenham, after said rape, request Wash Boulding, Jr., to read a letter for you, and did he not then read to you a letter from the defendant to you, in which defendant stated that he had committed the rape, and inquiring of you who was suspected of its commission, and if he was accused of it?"

A. "No. Wash Boulding never read any such letter for me nor any other letter for me, either after the rape or before it. I never received such a letter or any letter from defendant or any one else, in reference to the rape. Never received any letter from defendant, or purporting to be from him, after he left my house, after the alleged rape."

"Which testimony was objected to by the defendant at the time it was offered, on the grounds: (1) That the letter (if such ever existed) was the best evidence; that no effort had been shown by the State to procure or produce such letter upon the trial, or to prove its loss; and that the testimony was secondary: (2) That the testimony was inadmissible because the execution of the letter in the defendant's hand writing had not been shown, and no promise upon the part of the State was made to show such fact: (3) That said testimony was illegal and irrelevant to the issue of defendant's guilt, and was prejudicial to the defendant.

"But the court overruled said objections and admitted said testimony to the jury, to which decision of the court the defendant then duly excepted; and thereafter the defendant

moved the court to strike out said testimony and instruct the jury to disregard the same for the reasons and upon the grounds above alleged; but the court overruled said motion to strike out, and refused to exclude said evidence from the jury; to which decision of the court the defendant then excepted," etc.

Manifestly the object of this method of examination of the witness was to impress the jury with the idea that the witness had received a letter from defendant, in which the latter confessed that he had committed the crime. If the object was to prove the fact that such a letter had actually been written and received, then the proper practice would have been, in the first place, to have summoned the witness with a *subpœna duces tecum, or notice,* to produce the letter in court. (1 Greenlf. Ev., 13 Ed., secs. 557, 558, 559, 560.) Failing or refusing to produce it, the State then might have proven the fact by him, if a fact, that he did receive a letter, and if the witness knew that defendant wrote it, from his knowledge of his handwriting, or otherwise, he might also prove that fact. But, unless the letter was lost or mislaid so that it could not be produced, its contents even then could not be proven by the parol evidence of the witness, the letter itself being the best evidence of its contents so long as it was in existence.

Again, if the object was to impeach the witness, then the fact that he had or had not received a letter from defendant, which was the only fact about which the preliminary inquiry and predicate were allowable (Walker v. The State, 6 Texas Ct. App., 577), would be wholly immaterial in the case. And the witness having answered that question in the negative, that would be an end of the investigation, under the well established rule that " when a witness is cross examined on a matter collateral to the issue his answer can not be subsequently contradicted by the party putting the question." (Whart. Crim. Ev., 8 Ed., sec. 484; Brite v. The State, 10 Texas Ct. App., 368; Hart v. The State, 15 Texas Ct. App., 234; Johnson v. The State, 22 Texas Ct. App., 207; Rainey v. The State, 20 Texas Ct. App., 474.)

But the State did not stop the investigation of the matter with the denial of the witness that he had ever received such a letter, but called Wash Boulding, Jr., to the stand to contradict and impeach the witness Ford in this matter. This was in violation of the rule of evidence above quoted. This wit-

ness Boulding was permitted, over defendant's objections, to testify that Ford had requested him to read a letter directed to Ford, and that he did not know in whose handwriting the letter was, nor did he know defendant's handwriting. Boulding's testimony, under the facts, could not in the very nature of things impeach Ford as to a letter received by him from defendant, because there is no positive, certain or reliable evidence that defendant ever wrote such a letter, or that Ford ever received it, or that Boulding ever read a letter from defendant. Boulding may have read such a letter as he describes, but he can not know, nor do we, that the defendant wrote that letter, and until it is established by some legal method that he did write it, he can not in right, justice, good conscience or law, be held by any admissions it might contain.

It was most unfair and prejudicial to defendant's rights to conduct the investigation with regard to this letter in the manner in which it was done. No doubt the jury were firmly impressed with the fact that defendant had written a letter to Ford in which he confessed his guilt of this most heinous crime. The character of the investigation and the facts allowed to be proven were calculated to have this effect, whether they did or not. They should not have been permitted in the first place, and in the second place the only possible, if at all possible, manner in which the error could have been retrieved and injury avoided, would have been for the court to have stricken out the illegal testimony and instructed the jury to disregard it. We are constrained to repeat in this connection the remarks of Judge Willson in Gazley's case, a case involving a crime of the same nature. He says, "in a case like this, the very mention of which arouses public indignation, and fires the minds and passions of a community with a desire for vengance against the guilty party, the court and counsel engaged in the trial should be scrupulously cautious to accord to the defendants a fair and impartial trial, as free as possible from excitement or prejudice. There should be no clap trap or sharp practice made use of by counsel for the State. No improper means should be resorted to to prejudice the minds of the jury against the defendant in the remotest degree. No testimony should be offered on the part of the prosecution that is not relevant and legal." (17 Texas Ct. App., 283.)

Where the testimony was so doubtfully balanced as to the identity of defendant, who can say but that a bare intimation

of his having admitted or confessed the crime—unsupported as it was by any legal or reliable fact—was sufficient to kick the beam against him in the minds of the jury.

A number of objections are strenuously urged to the charge of the court to the jury. One or more of the paragraphs may, we think, be properly held obnoxious to the criticisms made upon them. For instance, in the sixth paragraph the jury were instructed that "penetration is necessary to complete the offense, but penetration only is necessary to complete the offense." It is declared by our statute that "penetration only is necessary to be proved upon a trial for rape." (Penal Code, art. 532.) But this does not mean that proof of penetration alone will, in and of itself, be sufficient without proof of the other statutory evidence and ingredients of the offense. The object of the declaration made in this article of the Code was simply to lay down one of the rules of evidence in cases of rape. Mr. Greenleaf says: "In the proof of carnal knowledge it was formerly held, though with considerable conflict of opinion, that there must be evidence both of penetration and of injection. But the doubts on this subject were put at rest in England by the statute of 9 George IV, c. 31, which enacted that the former of the two facts was sufficient to constitute the offense. Statutes to the same effect have been passed in some of the United States." (3 Greenl. Ev., 13 ed., sec. 210.) This is the object and purpose of our statute, to wit, that if penetration, which is essential to carnal knowledge, be proven, that will be sufficient, whether there be proof of injection or emission or not—the latter not being required to be proven.

Though such an instruction is in the language of the statute, and is abstractly correct law, it will be readily perceived that it is incomplete and calculated to mislead without some further explanation. Penetration alone is not the only proof necessary to complete the offense of rape. There must in addition be proof of want of consent of the woman, and that the act was accomplished by force, threats or fraud. (Penal Code, art. 528.)

Again, it occurs to us that the latter clause of the thirteenth paragraph is objectionable. The court thus instructs the jury, viz: "It is not sufficient, to secure a conviction for the State, to make out a prima facie case, but the guilt of the defendant must be shown beyond a reasonable doubt; *and the failure or inability of the defendant to show his innocence* does not lend any additional probative force to the incriminative facts, if any,

shown by the State, or raise any presumption of guilt against the defendant." Abstractly the proposition is correct, but the jury may well have inferred from it that, in the opinion of the court, the defendant had failed and been unable to show his innocence. No matter what the defendant's evidence was, or what it amounted to, he would be entitled to an acquittal if the jury had a reasonable doubt of his guilt. (Gazley v. The State, 17 Texas Ct. App., 267; Willson's Crim. Stats., sec. 2427.)

Again, we are of opinion that the latter portion of the fourteenth paragraph of the charge may have operated to the prejudice of appellant. The instruction is in these words, viz: "The defendant is presumed to be innocent until his guilt is proved beyond a reasonable doubt; and if upon the whole evidence you have a reasonable doubt of his guilt you must acquit him, *and not resolve the doubt by a mitigation of the punishment.*" The italicized words may have influenced the jury to inflict, as they have done, the death penalty instead of the milder punishment authorized by law.

With regard to the reasonable doubt, as prescribed in our law by article 727 of the Penal Code, this court has time and again held that the language of this long standing provision law was advisedly selected to express the precise meaning of the maker. "Its entire context should be preserved, and attempts to paraphrase or supplement it in a charge to the jury tend to perplex the jury and breed error." (Willson's Crim. Stats., sec. 2426.)

For the errors we have discussed, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*