**Mario MARQUEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69466.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 14, 1987.

---

Mark Stevens, Sharon MacRae, San Antonio, for appellant.

Sam D. Millsap, Jr., Dist. Atty., and Ed Springer, Ed Garcia and Daniel Thornberry, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appellant was found guilty of capital murder. The jury answered the special issues under Art. 37.071(b), V.A.C.C.P. affirmatively, whereupon the court assessed the mandatory penalty of death. Appellant raises twenty-eight grounds of error.

Although appellant does not challenge the sufficiency of the evidence a brief outline of the relevant facts is necessary to respond to several of appellant's grounds of error.

The indictment in the instant case alleges in pertinent part that,

on or about the 27th day of January, A.D., 1984, MARIO MARQUEZ, hereinafter called defendant, did then and there intentionally cause the death of an individual, namely: RACHEL GUTIERREZ, hereinafter called complainant, by strangling the said complainant with a ligature, and the said defendant did then and there intentionally cause the death of the said complainant while in the course of committing and attempting to commit the offense of AGGRAVATED SEXUAL ASSAULT upon RACHEL GUTIERREZ:
. . .

The deceased, Rachel Gutierrez, was the fourteen-year-old daughter of Rosa Gutierrez. The deceased resided at 2210 Hidalgo Street in the Villa Veramendi Courts in San Antonio with her mother, her ten-year-old brother, Daniel Gutierrez, and her eighteen-year-old sister, Rebecca Marquez. Rebecca Marquez was the estranged wife of appellant.

The record reflects that on the night of January 26, 1984, at approximately 7:30 p.m., Rosa Gutierrez left her apartment to go to a night club which featured a male strip show. Rosa was accompanied by a neighbor, Kim File, and Kim's mother, Virginia Stroh. Left behind at Rosa's apartment were Daniel Gutierrez, Rachel Gutierrez, Rebecca Marquez and Kim File's three young children.

At 2:30 a.m. on the morning of January 27, 1984, Rosa and the others returned to their apartments. Rosa found the door to her apartment locked from the inside so she knocked. She saw appellant look out of a window by the front door and then go upstairs briefly before letting her into the apartment.

After appellant unlocked the door to allow Rosa to enter he went directly upstairs. Rosa followed. She tried to enter her bedroom but found the door locked. Appel-lant, who was standing in the upstairs bathroom, spoke, "Come in, Rose. I've got a surprise for you ... I've got a surprise for you in the shower." Rosa replied, "No, I don't want to see. I don't want to see anything. I want to go to sleep." At this point appellant grabbed Rosa, dragged her into the bathroom and threw her to the floor. Appellant placed his hands on Rosa's throat and began choking her. Then, with one hand free, appellant unbuckled his pants and exposed his penis. He ordered Rosa to remove her clothing and place his penis in her mouth. When Rosa refused appellant hit her twice. Fearing for her life Rosa complied with appellant's demand for oral sexual contact. Appellant told her, "This is something I've wanted to do for a long time."

Rosa's son, Daniel, was locked in his mother's bedroom, but upon hearing his mother's cries he opened the bedroom door and saw her being assaulted in the bathroom. Rosa told him, "No, son. He is killing me. He's going to kill you, too. Don't—go call the police and run out. Please don't try to help me. Just get out." Daniel went downstairs and attempted to telephone the police.

Shortly thereafter appellant got scared and released Rosa, pulled up his pants and went down the hall to the bedroom used by Rosa's daughter, Rachel. Rosa followed. Inside, on the bedroom floor were the nude, brutalized bodies of Rachel Gutierrez and Rebecca Marquez. Appellant admitted to Rosa that he had killed both girls "to get even" and for "vengeance." Appellant then fled the scene and Rosa went downstairs to call the police.

Virginia Stroh and Kim File testified that shortly after entering their own apartment they heard screams coming from Rosa's apartment. They went to Rosa's apartment and were let inside by Daniel. Virginia Stroh went upstairs, saw the dead bodies and tried to calm a hysterical Rosa Gutierrez. Stroh also testified that she saw a man exit the apartment through the kitchen although she could not identify him. Kim File identified the man as appellant.

Officer Manuel Lopez of the San Antonio Police Department was the first officer on the scene after being dispatched to investigate a "family disturbance." He arrived at approximately 2:33 a.m. After discovering the dead bodies Officer Lopez called an ambulance, obtained a description and picture of appellant and sealed off the apartment.

Shortly thereafter, detectives Eleazar Galindo and Fernando Ceasares arrived at the scene and began collecting physical evidence. Among the items collected were two beer cans found in Rachel's bedroom. A latent fingerprint found on one of the beer cans matched that of appellant.

Rosalio Perez, a neighbor, testified that he was awakened at approximately 4:00 a.m. on the morning of January 27, 1984, by the noise of police helicopters which were searching for appellant. Perez was again awakened at 6:00 a.m. when he heard a noise in his backyard. He observed a man wearing tennis shoes and dark clothing climbing his fence and running through his back yard. Perez called the police who began searching the area some four blocks from the murder scene. Later, Perez discovered that a jacket he had hung on a clothes line in his back yard was missing. When appellant was apprehended he was wearing the missing jacket.

Angelita Vasques testified that on the morning of January 27, 1984, she received a telephone call from appellant who asked to speak to her daughter, Elida Vasquez. Appellant had previously lived with Elida. Angelita informed appellant that Elida was not at home and appellant hung up. Almost immediately appellant called again saying that he was using a pay telephone near an icehouse on Palo Alto Street. He admitted to Angelita that he had strangled two women. Initially, Angelita was scared that appellant had strangled her daughter but appellant told her it was his "other girl." Angelita identified appellant at trial saying she had known him for ten years and could easily recognize his voice. After the second call Angelita called the police and met Officer Wayne Harrell near the icehouse.

Officers Harrell and R.B. Garcia arrived at the corner of Palo Alto and Cree Street at around 7:30 a.m. and observed appellant using a telephone at an abandoned icehouse. Appellant saw the officers and attempted to run away but he was caught and arrested some two miles from the scene of the murders. Appellant was taken to the police station where he was placed in the custody of homicide detectives at around 8:00 a.m. His clothing, which was bloodstained, was taken for analysis by the detectives.

Dr. Suzanna Dana, deputy chief medical examiner at the Bexar County Medical Examiner's Officer performed autopsies on both bodies on the morning of January 27th. The autopsies included external and internal examinations, as well as a rape test.

The autopsy performed on Rachel Gutierrez, the deceased in the instant case, revealed that she had been killed by ligature strangulation—that is strangulation using a cord, wire or piece of cloth. Dr. Dana also testified that she found bite marks on the deceased's right breast and in her pubic area along with superficial lacerations around her anus and perineum which could have been caused by the insertion of an erect penis. In addition, approximately ten short human hairs were found in the deceased's mouth.

Dr. Dana was also of the opinion that because of the loss of blood and bruising, the bite marks as well as the lacerations of the anus and perineum were inflicted while the victim was alive or at or near the time of her death. Fluid found in the lungs of the deceased along with the swelling of her brain indicated to Dr. Dana that, while the deceased might have lost consciousness within seconds, it probably took as long as ten minutes to die from ligature strangulation. Testing revealed the presence of sperm in the deceased's rectum.

The autopsy of Rebecca Marquez yielded similar results. She was also killed by ligature strangulation and had bite marks to the pubic area and right breast. Dr. Dana also found a bottle of cologne inside Rebecca Marquez's rectum. Testing re-

vealed the presence of sperm in Rebecca Marquez's vagina.

Heather Mann, a forensic serologist, performed blood tests on appellant, the deceased and Rebecca Marquez. She determined that all three had different blood types and that the blood found on appellant's clothing was consistent with the deceased's type.

The State also presented testimony linking appellant with the murders by matching a cast of his teeth with the bite marks found on both bodies. Dr. Bill Baker, a professor of Dental Diagnostics and Dental Pathology at the University of Texas Health Science Center, was called to the Bexar County Medical Examiner's Office on January 27, 1984, in order to photograph the bite marks exhibited on the bodies. Then, on April 17, 1984, pursuant to a search warrant, Dr. Baker made dental casts of appellant's teeth. Dr. James Cottone, a forensic dentist, testified that a comparison of the photographs and casts showed that the bite marks were consistent with appellant's teeth pattern.

At the close of the State's case in chief, appellant closed without offering any evidence. The trial court overruled appellant's motion for instructed verdict. The jury found appellant guilty of the capital murder of Rachel Gutierrez.

During the punishment phase of appellant's trial the following evidence was introduced by the State in an effort to persuade the jury to answer the special punishment issues affirmatively. At the outset Richard Burch, the clerk of the 226th District Court of Bexar County, testified that the records of the court revealed that appellant pleaded guilty to four burglary charges on January 1, 1984. Appellant was released on bail pending sentencing which was to be made on February 2, 1984. James A. Schofield, a probation officer, described preparing a pre-sentencing report for the trial court concerning the four burglary convictions. Appellant admitted to Schofield his participation in the crimes, including the theft of guns, and a high speed chase with the police. Schofield's investigation also revealed that appellant was charged with felony theft in 1977, but that this charge was later reduced to a misdemeanor.

Several police officers described appellant's participation in the high speed chase which occurred on June 29, 1983, in connection with his arrest for the four burglaries. Testimony revealed that the vehicles reached speeds in excess of 100 miles per hour and, at one point, the getaway vehicle crossed a median and sped down the wrong side of the highway forcing ten to fifteen cars off the road. After stopping the vehicle, police discovered appellant behind the wheel. There was some evidence that shots had been fired from the getaway vehicle. However, there were four men inside the car and it could not be shown who fired the shots.

Several jail guards and fellow prisoners described appellant's conduct while he was incarcerated for the instant offense and others. Rogelio Garcia, a Bexar County jail detention guard, testified that on April 16, 1984, he ordered appellant to remove some pictures from his cell wall. Appellant became hostile, began cursing, grabbed the cell bars, and refused to remove the pictures. Appellant shouted at Garcia's superior, "You are not going to take them down either." Only when the cell door was opened did appellant comply with the order.

Jesse Alvarez, a jail guard, testified that he discovered a homemade knife or "shank" fashioned from a toothbrush and a nail on appellant's person on May 23, 1984.

Two other jail guards described fights between appellant and other inmates occurring on March 24, 1984, and May 22, 1984. Another guard testified that appellant threw a coffee pot at a fellow inmate on September 16, 1984.

Jimmy Martinez, a former cellmate of appellant, testified that appellant kicked him in the head one morning and accused him of being an informer. During the ensuing altercation appellant stabbed Martinez with a ball point pen. Martinez also testified that on two other occasions appellant tried to choke him by placing Martinez in a headlock. Finally, Martinez testified that appellant carried a sharp glass blade

weapon which he concealed in an airvent in the cell.

Two trial court bailiffs were called to testify. Bailiff Alex Jasso recalled that appellant admitted killing the two women. Appellant said, "I did it" and "I'm not afraid of the needle" or "I'm not afraid to die."

The final witnesses called by the State during the punishment phase described an altercation occurring at the noon recess on the first day of punishment evidence. As appellant was being escorted down the courthouse hallway, he knocked the camera from the shoulder of one cameraman who was filming his departure and spat on the lens of another camera. Over defense counsel's objection video tape of the incident was shown to the jury.

Finally, bailiffs Frank Pacheco and Albert Barrera, who were escorting appellant during the incident, heard appellant say: "Next time I'll just run so you will have to shoot me."

At the close of the State's case the appellant again closed without calling any witnesses. The jury was instructed and heard the arguments of counsel. After deliberation the jury returned affirmative answers to both special punishment issues submitted.

In ground of error number seven appellant challenges the trial court's refusal to include within the charge to the jury at the guilt/innocence phase of trial an instruction on the lesser included offense of voluntary manslaughter. Appellant argues that evidence presented during the guilt/innocence phase of trial raised the possibility that appellant, if guilty of an offense, was guilty only of voluntary manslaughter. Specifically, appellant points to evidence that Rosa Gutierrez testified that he looked "furious" and that he told her he had killed the girls "to get even" or for "vengeance." Also, the bite marks on the bodies were described by Dr. Cottone, the forensic dentist, as "savage." A perfume bottle had been forced into the rectum of Rebecca Marquez. Angelita Vasquez testified that appellant told her he had killed the girls "because I want to treat people right so

they can treat me right and nobody was going to laugh in my face."

V.T.C.A., Penal Code, Sec. 19.04 defines "voluntary manslaughter":

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that would commonly provide a degree of anger, rage, resentment, or tenor in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

It is well established that if evidence from any source raises the issue of a lesser included offense or a defensive theory, it must be included in the court's charge. *Ojeda v. State*, 712 S.W.2d 742 (Tex.Cr. App.1986); *Bell v. State*, 693 S.W.2d 434 (Tex.Cr.App.1985); *Lugo v. State*, 667 S.W.2d 144 (Tex.Cr.App.1984). As this court said in *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Cr.App.1978):

The credibility of evidence and whether it is controverted or conflicts with other evidence in the case may not be considered in determining whether a defensive charge or an instruction on a lesser included offense should be given. When evidence from any source raises a defensive issue or raises an issue that a lesser included offense may have been committed ... the issue must be submitted to the jury. It is then the jury's duty, under the proper instructions, to determine whether the evidence is credible and supports the defense or the lesser included offense.

■ A charge on voluntary manslaughter should only be given when there is evidence that the defendant acted under

the "immediate influence of sudden passion arising from adequate cause." *Ojeda,* supra; *Hobson v. State,* 644 S.W.2d 473, 478 (Tex.Cr.App.1983); *Cerda v. State,* 557 S.W.2d 954 (Tex.Cr.App.1977). We have closely examined the record and can find no evidence that the deceased or another acting with the deceased did anything to provoke sudden passion in appellant. It is not enough that appellant acted mad and upset, the evidence must also show that the anger was the result of an act of provocation on the part of the deceased or a third party acting in concert with the deceased. V.T. C.A., Penal Code, Section 19.04(b).

Appellant cites *Bradley v. State,* 688 S.W.2d 847 (Tex.Cr.App.1985) for the proposition that if evidence shows a defendant seemed enraged or terrified before acting, a charge on voluntary manslaughter should be given. Appellant has misconstrued *Bradley,* supra. In *Bradley,* supra, the provocation element was clearly present. Prior to being killed the deceased kicked down the defendant's door, "slung" a knife across the room and threatened the defendant with death. After this a struggle ensued during which the deceased was fatally wounded. However, missing from the case, was any evidence that the defendant acted under the influence of sudden passion. The quotation relied upon by appellant here was simply the Court's explanation that had the evidence shown that the defendant in *Bradley,* supra, acted under the influence of sudden passion a charge of voluntary manslaughter would have been proper. This is so because the provocation element was already present.

The record does not show any evidence of provocation on the part of the deceased or another acting with the deceased. In the absence of such evidence the offense of voluntary manslaughter is simply not raised. Appellant's ground of error number seven is overruled.

Closely related to ground of error number seven is ground of error number eight, in which appellant challenges the trial court's refusal to include in the charge to the jury at the punishment phase of trial, an instruction submitting special issue number three on provocation.

Article 37.071(b)(3), V.A.C.C.P. reads:

(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(3) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Appellant cites the evidence relied upon in ground of error number seven plus evidence adduced at the punishment phase which suggested that Rebecca Marquez may have been unfaithful to appellant.

■ "In order to raise the issue of provocation, it is necessary that there be evidence of the deceased's conduct just prior to her death; also, that evidence must be sufficient to be considered provocation." *Hernandez v. State,* 643 S.W.2d 397, 401 (Tex.Cr.App.1982). There is no evidence in the record concerning the deceased's conduct immediately prior to the killing. Appellant suggests that perhaps the infidelity of Rebecca Marquez can be considered as provocation in the instant case. Under the statute the actions of a third party cannot be considered as provocation for the capital murder of another. The statute specifically focuses attention on the action of the deceased. Appellant's eighth ground of error is overruled.

In ground of error number one appellant challenges the trial court's refusal to include in the charge to the jury during the punishment phase of trial an instruction to limit the jury's consideration of punishment evidence to conduct committed only by appellant himself.

Appellant's argument focuses on the evidence adduced by the State during the punishment phase that shots were fired from a getaway vehicle driven by appellant on June 29, 1983. Several police officers involved in the high speed chase testified that shot were fired at them from appellant's automobile. However, there were four men inside the vehicle and no one could be sure who had fired the shots.

Appellant claims that since the State was unable to show that appellant had fired the shots himself an instruction should have been given to the jury which would limit its consideration of punishment evidence to acts specifically shown to have been committed by appellant. Appellant argues that such an instruction is mandated by this Court's ruling in *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984). We do not agree.

In *Green*, supra, the defendant was found guilty of murder during the course of robbery and was sentenced to death. The defendant was aided by three cohorts and on appeal he argued that the evidence was insufficient to support the jury's affirmative answer to special punishment issue number one concerning the deliberateness of the defendant's conduct. This Court found the evidence sufficient to establish the *guilt* of the defendant based on the law of parties under V.T.C.A., Penal Code, Secs. 7.01 and 7.02, but held that the law of parties could not be relied upon to prove the special punishment issue of deliberateness. Specifically, the Court found that:

> The statutes [Sections 7.01 and 7.02] clearly address *conviction* and *guilt* for an *offense*. Neither Sec. 7.01 nor Sec. 7.02 addresses the punishment phase of trial. Indeed, the language of the statute does not concern punishment at all. Rather, the Legislature enacted Art. 37.-071, V.A.C.C.P., specifically to cover punishment issues in a capital murder case. Those special issues do not define 'offense': they are tailored to guide a jury in examining the culpability and conduct of the individual defendant, . . .

*Green*, supra, at 286.

> The Court went on to conclude that: It is error to apply directly the law of parties to any of the punishment issues in a capital murder case—that is, so a capital defendant may be punished for the deliberate conduct of another, the future dangerousness of another or the unreasonable response to provocation of another—without regard to the individu-

al conduct of the defendant whose fate is in question.

*Green*, supra, at 287, quoting *Meanes v. States*, 668 S.W.2d 366, 376 (Tex.Cr.App. 1983).

■ Appellant's reliance on *Green*, supra, is misplaced. The Court in *Green*, supra, simply forbade the giving of an instruction on the law of parties at the punishment phase of a capital murder case. However, in cases where a law of parties charge was given during the guilt/innocence phase of a capital case a prophylactic instruction should be given, if requested, which would instruct the jury to limit its consideration of punishment evidence to conduct shown to have been committed by the defendant. *Green*, supra, at 287, n. 4. The context within which these rules were stated makes it abundantly clear that the Court was talking about the facts of the case itself. The Court was addressing the problem of sentencing a person to death who may have only been a party to the capital murder offense itself.

In the instant case no charge on the law of parties was given during the guilt/innocence phase of trial. Indeed, the evidence clearly shows that no one was involved in the murder other than appellant. This being the case the rules established in *Green*, supra, do not apply.

■ Appellant does not contend that evidence presented during the punishment phase of trial was in any way inadmissible. He alleges only that the injection of evidence of possible conduct of another at the punishment phase invokes a requirement to submit the requested charge. Generally, an instruction limiting the jury's consideration of certain evidence is not required when the evidence is admissible to prove a main fact in the case. *Porter v. State*, 709 S.W.2d 213, (Tex.Cr.App.1986); *McWherter v. State*, 607 S.W.2d 531 (Tex.Cr.App.1980); *Ruiz v. State*, 523 S.W.2d 691 (Tex.Cr.App. 1975); *Lapp v. State*, 519 S.W.2d 443 (Tex. Cr.App.1975); *Dillard v. State*, 477 S.W.2d 547 (Tex.Cr.App.1971); *Lacy v. State*, 424 S.W.2d 929 (Tex.Cr.App.1967). During the punishment phase of a capital murder trial the State has the burden of proving that

the defendant will probably commit acts of violence in the future that would constitute a continuing threat to society. Evidence that appellant drove a car down the wrong side of the highway at speeds in excess of 100 miles per hour, forcing fifteen other cars off the road, and that shots were fired at the police from that car is very relevant to this issue. This evidence was not admitted for a limited purpose but to prove one of the "main facts" provable during the punishment phase, See Art. 37.071(b)(1), (2), and (3), thus, no limiting instruction is required. Appellant's first ground of error is overruled.

In ground of error number two appellant challenges the trial court's refusal to include in the charge to the jury at the punishment phase of trial an instruction which would limit the jury's consideration of extraneous offense to those which were proved beyond a reasonable doubt to have been committed by appellant.

A similar contention was made in *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App. 1986). In *Santana*, supra, the Court held that the failure to give such an instruction was not error. As the Court explained, Art. 37.071(a), V.A.C.C.P., provides that during the punishment phase of a capital murder case "evidence may be presented as to any matter that the Court deems relevant to sentence." Numerous cases have interpreted this to mean that evidence of unadjudicated extraneous offense are admissible. *Santana*, supra; *Rumbaugh v. State*, 629 S.W.2d 747 (Tex.Cr.App.1982); *Smith v. State*, 683 S.W.2d 393 (Tex.Cr. App.1984).

■ The Court in *Santana*, supra, pointed out that the defendant was adequately protected by the other portions of the charge which required the jury, based on the evidence presented, to believe *beyond a reasonable doubt* that the defendant would commit future criminal acts of violence before they could answer the second special

punishment issue affirmatively. The instant case contains a similar provision which likewise adequately protects appellant.[1] Appellant's second ground of error is overruled.

In ground of error number twenty-eight appellant complains of the introduction of unadjudicated extraneous offenses at the punishment phase of trial. For example, the State introduced that appellant had led police on a dangerous, high speed automobile chase, was a disciplinary problem while in jail, and had assaulted cameramen during the instant trial.

■ In our discussion of appellant's second ground we explained that any evidence of unadjudicated extraneous offenses was admissible if relevant to a penalty issue during the punishment phase of a capital murder trial. In fact, this Court has many times so held. See *McCoy v. State*, 713 S.W.2d 940 (Tex.Cr.App.1986); *Smith v. State*, 683 S.W.2d 393, 406 (Tex.Cr.App. 1984); *Rumbaugh v. State*, 629 S.W.2d 747, 754 (Tex.Cr.App.1982); *May v. State*, 618 S.W.2d 333, 342 (Tex.Cr.App.1981); *Williams v. State*, 622 S.W.2d 116 (Tex.Cr. App.1981); *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr.App.1979). The evidence of unadjudicated extraneous offenses was clearly relevant to appellant's future dangerousness. Appellant's twenty-eighth ground of error is overruled.

In ground of error number three appellant argues that it was error to compel appellant to appear and remain in the presence of the jury wearing handcuffs and leg irons during the punishment phase of trial. Appellant argues that such action violated his right to a presumption of innocence, to a fair trial and to due process of law. Additionally, appellant argues that it amounted to a comment on the weight of the evidence and diminished the State's burden of proof with regard to the second

---

1. The relevant portion of the charge to the jury on punishment reads:

    The State has the burden of proving each issue submitted at the punishment phase beyond a reasonable doubt. Any juror who has a reasonable doubt that the answer should be 'yes' as to a special issue shall vote 'no' to that special issue ...

    In order for the jury to answer a special issue 'yes' the jurors must unanimously agree that the answer is 'yes' beyond a reasonable doubt regarding that special issue.

special punishment issue on future dangerousness.

■ It must be noted that the only time the jury saw appellant in handcuffs and leg irons was during the punishment phase of trial.[2] Appellant's right to a presumption of innocence terminated after he was found guilty of capital murder. Thus, at the time appellant was shackled he had no right to a presumption of innocence. The caselaw relied upon by appellant deals exclusively with the situation where a defendant wears shackles before the jury during the guilt/innocence phase of trial. In *Walthall v. State*, 505 S.W.2d 898 (Tex.Cr.App.1974), where the defendant was brought before the jury in handcuffs and chains during the guilt phase, this Court held that absent any good and sufficient reason for such extraordinary measures, the display deprived the defendant of his presumption of innocence. Similarly, in *Gray v. State*, 99 Tex. Cr.R. 305, 268 S.W. 941, 269 S.W. 1056 (Tex.Cr.App.1925), this Court pointed out that when a defendant is brought into the courtroom during trial in shackles, reversal must follow unless the record reflects a good and sufficient reason for pursuing this extraordinary course.

In *Moore v. State*, 535 S.W.2d 357 (Tex. Cr.App.1976), the defendant was brought into court during the guilt phase of trial handcuffed and escorted by the sheriff on two separate occasions. On three occasions the jury was allowed to see the defendant in handcuffs. This Court held that "the harm a defendant suffers when a jury sees him in handcuffs is that his constitutional presumption of innocence is thereby infringed. *Thompson v. State*, 514 S.W.2d 275 (Tex.Cr.App.1974); *Walthall v. State*, 505 S.W.2d 898 (Tex.Cr.App.1974); *Hernandez v. Beto*, 443 F.2d 634 (5th Cir.1971); ..." *Moore*, supra, at 358.

Thus, the caselaw relied upon by appellant is distinguishable because the cases involved the guilt/innocence phase not the punishment phase of trial. However, while a defendant's handcuffed or shackled appearance before a jury at the punishment phase of trial does not merit the strict review mandated in the cases above, we will address appellant's contention that such practice constitutes a comment on the weight of the evidence. Review is merited especially in a capital murder case where a defendant's future dangerousness is at issue.

The proper standard for reviewing cases where a defendant was shackled during the guilt/innocence phase of trial has been well established in Texas. In *Freeman v. State*, 556 S.W.2d 287, 306 (Tex.Cr.App. 1977), cert. denied 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794 (1978), this Court explained the proper standard for review. The Court quoted *Thompson v. State*, 514 S.W.2d 275, 277–278 (Tex.Cr.App.1974):

It is within the discretion of the trial judge to require uniforms and handcuffs for a defendant. See *Ex Parte Slaton*, Tex.Cr.App., 484 S.W.2d 102 (1972); *Hernandez v. Beto*, supra, [443 F2d 634 (5th Cir.)] and *Kennedy v. Cardwell*, 487 F.2d 101 (6th Cir.1973).... The test on appeal is whether the trial court abused its discretion in requiring the witnesses to appear in jail uniforms and in handcuffs. To enable this Court to review the trial court's action on appeal, the record should contain factual matters on which the trial court's discretion was based. It must appear in the record that in exercise of its discretion the trial court had a fair knowledge and understanding of all such factual matters ...

In a case where a defendant was tried in handcuffs, this Court wrote that if for security reasons handcuffs were necessary the trial judge should have the record clearly reflect the reasons therefor. That record must affirmatively reflect those reasons, not in general terms but with particularity. See *Romero v. State*, Tex.Cr.App. 493 S.W.2d 206 (1974). *Walthall v. State*, Tex.Cr.App., [121 Tex.Cr.R. 5] 505 S.W.2d 808 (1974) · · ·

And in *Gray*, supra, 268 S.W. at 949, this Court stated:

which was concealed beneath his trousers and thus, not visible to the jury.

---

2. Appellant apparently wore a leg brace throughout the guilt/innocence phase of trial

... the rule may be fairly stated that if the record discloses no good reason for having the prisoner manacled during the trial the same will be cause for reversal; on the other hand, if, in the sound discretion of the court, it appears necessary to retain his shackles to prevent the escape or self-destruction of the prisoner, or to prevent him from injuring bystanders or officers of the court, or if necessary to maintain a quiet and peaceable trial, the court may try the prisoner without having the shackles removed; his action being subject to the closest scrutiny and review by the appellate court.

In the instant case, during the afternoon session of the first day of the punishment phase, the trial judge ordered that appellant be handcuffed and shackled for the remainder of the trial. The judge made the following findings as justification for the order on November 26, 1984, just prior to instructing the jury on punishment.

THE COURT: ... I will go ahead and make my findings of fact at this time. The defendant has been found guilty of choking the complainant to death. At the same time he choked his former wife to death. The defendant while in jail has carried deadly weapons on his person. The Defendant while in jail stabbed a fellow inmate with a ballpoint pen. The Defendant while in jail choked a fellow prisoner. In 1983 the Defendant attempted to murder a uniformed officer driving a marked autombiles [sic] while trying to evade arrest for four burglaries. The Defendant endangered the lives of many innocent people while trying to evade arrest by driving on the wrong side of the freeway.

Since being found guilty of capital murder while being transferred from the courtroom the Defendant attacked a television cameraman by knocking his television camera to the floor and on the same occasion, spit on another cameraman or spit on a camera. In fact, since being found guilty of capital murder the Defendant threatened prosecutor Ed Garcia in the courtroom.

The Defendant on numerous occasions since being found guilty of capital mur-

der has threatened to run and cause the officers to have to shoot him and kill him. Unless his legs are chained there is a danger he will do so.

The Defendant is young, powerful and very quick and there is a grave danger he might grab the firearms of an officer and kill officers of the court and onlookers unless he is kept in handcuffs.

MR. SPRINGER: May I add something to the court's findings, Your Honor?

THE COURT: Yes, sir.

MR. SPRINGER: I believe that the Court was correct that the Defendant did have the leg brace on at the time that he assaulted the cameraman.

THE COURT: That failed to restrain him from assaulting a cameraman who was anywhere from three to five feet away and while counsel for Defendant has frequently referred to the situation as being a circus atmosphere, the court finds that no such atmosphere has existed either in the courtroom or in the hall except that which was brought on by the Defendant himself when he attacked the cameraman.

In fact, two disputes took place in the hall and the court immediately removed people that [sic] engaged the defendant in an argument. And there has been absolutely no circus atmosphere tolerated and none will be tolerated. All right. Anything else?

MR. SPRINGER: Yes. I believe that the Defendant has told the court that he was thinking about committing suicide and has told the bailiffs and everybody he wasn't afraid of the needle and he was not afraid to die, which shows that he is an extremely dangerous individual.

THE COURT: Well, the court adopts those statements as part of the findings and there is at least one more in the courtroom that has four young children that [sic] is an officer of the court whose life would be in danger. There's several others with children to be raised. There's numerous officers of the court, bystanders, people whose lives would be in danger if this Defendant were allowed to not be handcuffed. There is no doubt

in this court's mind that he is a grave danger to the people in this courtroom as well as to himself.

At the time the trial judge made his findings he had already heard all of the evidence presented at both the guilt/innocence and punishment phases of trial. Some of his findings were based on the evidence then presented and summarized at the outset of this opinion. In the interests of time and space we will not review that evidence here. However, certain other evidence, presented close to the time and at the time of trial, obviously bore on the judge's findings and it will be reviewed.

On July 12, 1984, a hearing was held on a motion for withdrawal of appellant's counsel because of appellant's inability to pay. During that hearing the following testimony was elicited.

THE COURT: Obviously you don't have the money so I'm going to appoint a lawyer to represent you.

MR. MARQUEZ: That's okay, sir, because I ain't got to talk to him. I ain't got to talk to no State's attorney. I would rather be dead than talk to a State's attorney.

THE COURT: That may be exactly the problem you face. You understand that you are charged with capital murder which could result in the death penalty for you?

MR. MARQUEZ: That's okay.

THE COURT: So its not one of these things that can be taken lightly. It is a very—

MR. MARQUEZ: Anyway I was going to take my life last night. I was about to do it last night.

THE COURT: I see you didn't do it. All right. I want to thank you all very much.

On October 18, 1984, a pretrial hearing was held on appellant's motion to suppress certain oral statements made while in custody. During the course of that hearing Detective Anton Michalec testified as to remarks made by appellant at the police station shortly after his arrest.

Q. [by the State's Attorney]: Did he say anything else about—

A. Well, he did indicate that the police officer that [sic] apprehended him where he was apprehended was yellow for not shooting him and he said he wished he would have shot him and just got it over with and he indicated that—by his actions and so forth that—I took it he might try to commit suicide, and I called the jail and notified the jail that he may have some suicidal tendencies at the time, so 'watch him.'

Q. Did he say whether or not he told the officer that the officer was yellow for not shooting him?

A. No, sir.

Q. What did he say?

A. He just told me in his own words that he felt that the officer should have shot him when he apprehended him and just gotten it over with then and there.

Q. Did he say why the officer should have shot him?

A. No, he said he wasn't a man, though, for not shooting him ...

\* \* \* \* \* \*

Q. [by appellant's counsel] All right. 'He said after this he wanted to commit suicide and would hang himself?'

A. Yes.

Q. He did say that.

A. Yes.

Q. Did he specifically mention that he wanted to hang himself?

A. Yes, ma'am. It would not be in my report if he didn't.

Q. All right. What did you say to that?

A. Well, I made no reply, but like I said earlier, I did call the jail because he made those threats. I was concerned that he might try to harm himself and I told him what he said.

Q. All right. Then also he talked of how he wanted the police officer that caught him to shoot him?

A. Yes.

Later during the hearing evidence was presented to show that appellant was the subject of a prior outstanding arrest war-

rant for robbery involving a bodily injury. The outstanding warrant was issued three weeks before the murder in the instant case.

On November 26, 1984, one of the State's Attorneys, Edward Garcia, stated in closing argument that,

[A]fter the altercation that was had Monday at the doorway [3] when Mr. Marquez was brought in and sat down by the bailiffs, he was cursing in Spanish and he said something to the effect that 'I'm tired of people treating me like an animal.' And I was sitting to his left and Mr. Marquez looked at me and glared at me and said, 'That goes for that guy sitting at the table there.'

Earlier on November 26, 1984, the court, outside the presence of the jury heard the following testimony from Lieutenant Billhartz of the Bexar County Sheriff's Department.

THE COURT: All right. Have you been supervising the handling of the Defendant, Mario Marquez, through the time he has been charged with the capital offense?

MR. BILLHARTZ: Yes, I have.

THE COURT: All right. Let me ask you this. In your opinion are the threats and actions of the Defendant such that you feel it is necessary that he be handcuffed and have leg irons during the rest of this trial?

MR. BILLHARTZ: Yes, I believe they are.

* * * * * *

Q. [by appellant's counsel]: Are you familiar with the leg brace Mr. Marquez is wearing right now?

A. Yes, I am.

Q. What is the purpose of that leg brace?

A. To keep a person from running.

Q. Okay. Do you have any information that Mr. Marquez has actually run off anytime during this trial?

A. Not yet, but he's made statements to the effect.

Q. Okay. But no actual running?

A. No. I don't have any information

MR. STEVENS: That's all we have.

THE COURT: If he were not handcuffed, would there not be a danger of his grabbing the pistol of one of these bailiffs.

MR. BILLHARTZ: I think that is true.

THE COURT: And would the lives of all the court officers be endangered?

MR. BILLHARTZ: It would.

■ After this testimony the trial judge made the findings above and overruled appellant's final objection to the handcuffs and leg irons. Appellant was not displayed to the jury in leg irons and handcuffs prior to their convicting him of capital murder. In light of appellant's past history and more recent actions close to the time of trial and during the trial we hold that the trial judge was entirely justified in ordering the shackles in order to prevent his escape or self-destruction and to protect other persons present in the courtroom. The judges findings are amply supported by the record. Therefore, we cannot say that it was an abuse of discretion for the judge to order appellant shackled during the punishment phase of trial. Appellant's third ground of error is overruled.

In appellant's grounds of error number four and five he argues that the trial court erred by permitting admission before the jury of the video tapes of his incident with the cameramen outside the courtroom because the tape clearly showed he was escorted by armed guards. Such constituted a violation of his rights to due process and equal protection of the law.

The video tapes were shown to the jury only during the punishment phase of trial. As the United States Supreme Court has pointed out in *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the noticeable deployment of security personnel around a defendant is not as inherently prejudicial as shackling. Appellant argues that the evidence was only cumulative of the testimony of the cameramen themselves and was more prejudicial than probative. We do not agree.

---

**3.** This refers to the incident with the television    camera.

As with all evidence that is to be introduced at either stage of a criminal trial, a two-stage test must be met. The evidence must first be relevant to a material issue in the case. Secondly, the evidence must possess probative value which outweighs its inflammatory or prejudicial effect. *Plante v. State,* 692 S.W.2d 487 (Tex. Cr.App.1985); *Williams v. State,* 662 S.W.2d 344 (Tex.Cr.App.1983). The evidence introduced in the instant case is clearly relevant. Appellant's future dangerousness is a material issue in the punishment phase of a capital murder case. Evidence which shows appellant's violent nature bears directly on whether he will commit violent acts in the future such that he will be a continuing threat to society.

The second inquiry is whether the evidence was more probative than prejudicial. Wide latitude has been afforded trial judges in deciding the admissibility of evidence at the punishment phase of a capital murder case. Such latitude has allowed the introduction of unadjudicated extraneous offenses. See *Mayo v. State,* 708 S.W.2d 854 (Tex.Cr.App.1986); *Sharp v. State,* 707 S.W.2d 611 (Tex.Cr.App.1986); *Green v. State,* 587 S.W.2d 167 (Tex.Cr.App.1979). In *Granviel v. State,* No. 69,‑177, 723 S.W.2d 141 (Tex.Cr.App.1986), this Court held that evidence of a defendant's misconduct while in custody awaiting trial for a capital case is admissible. See also *Fierro v. State,* 706 S.W.2d 310 (Tex.Cr. App.1986) *Simmons v. State,* 594 S.W.2d 760 (Tex.Cr.App.1980). Cf. *Jordan v. State,* 707 S.W.2d 641 (Tex.Cr.App.1986). Considering the wide latitude afforded judges in this area, the fact that appellant had already been convicted, and had been handcuffed and shackled, together with the importance of the punishment issue to be decided, we cannot say that the showing of the video tapes which depicted appellant in custody was more prejudicial than probative. Appellant's fourth and fifth grounds of error are overruled.

In grounds of error eleven, twelve, thirteen, fourteen and fifteen appellant argues that the affidavit used to seize a sample of his blood and to take casts of his teeth is insufficient under the two-pronged standard for analyzing probable cause established in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 2 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Additionally, appellant argues that the affidavit is insufficient under Art. 18.01(c), V.A.C.C.P. For these reasons appellant urges that the admission of this evidence constitutes a violation of his constitutional rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, Art. I, Sec. 9 of the Texas Constitution and Art. 38.23, V.A.C.C.P.

Appellant claims that the affidavit used as an application for a search warrant to procure a sample of his blood violates Art. 18.01(c), V.A.C.C.P.

Art. 18.01(c) requires that:

A search warrant may not be issued pursuant to subdivision (10) of Article 18.02 of this code unless the sworn affidavit required by Subsection (b) of this article sets forth sufficient facts to establish probable cause: (1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place or thing to be searched ...

Specifically, appellant argues that the second requirement is lacking, i.e., the affidavit does not establish probable cause that "the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, ..." We have reviewed the affidavit and find it hard to believe that such an argument can be seriously made.

The affidavit used to obtain the search warrant for blood and pubic hair samples from appellant, along with a plaster cast of his teeth, reads in pertinent part:

3. IT IS THE BELIEF OF THIS AFFIANT AND AFFIANT HEREBY

CHARGES AND ACCUSES, THAT SAID SUSPECTED PARTY HAS POSSESSION OF AND IS CONCEALING ON HIS PERSON THE FOLLOWING DESCRIBED PERSONAL PROPERTY TO–WIT: BLOOD, TEETH, AND PUBIC HAIR.

4. AFFIANT HAS PROBABLE CAUSE FOR THE SAID BELIEF BY REASON OF THE FOLLOWING FACTS, TO–WIT: your affiant has reason to believe and does believe that the evidence to be searched for is in the location to be searched based on the following information from the police and autopsy reports and sworn statements in San Antonio Police Department Case number 84–30374, indicate that on January 27, 1984, REBECCA MARQUEZ and RACHEL GUTIERREZ were each killed by ligature strangulation in San Antonio, Bexar County, Texas. MARIO MARQUEZ, the subject of this application for a search warrant, is at present under indictment for Capital Murder of RACHEL GUTIERREZ, (Cause No. 84–CR–0905), and REBECCA MARQUEZ, (Cause No. 84–CR–0982). He was seen at the residence where the bodies were found, 2210 Hidalgo Street, San Antonio, by ROSA GUTIEREREZ and DANIEL GUTIERREZ, at the same time the bodies were found. In fact, he led ROSA GUTIERREZ to the room where the bodies were, and stated in her presence, 'YA ME DESQUITE,' a phrase in Spanish which generally translates in English to, 'NOW I HAVE AVENGED MYSELF.' Also, his fingerprints were found on a beer can in the room where the bodies were found.

The bodies of REBECCA MARQUEZ and RACHEL GUTIERREZ were autopsied on January 27, A.D., 1984, by Deputy Bexar County Medical Examiner, Dr. Suzanna E. Dana. Dr. Dana found ten short black hairs in the mouth of RACHEL GUTIERREZ. Your affiant believes that these may be the pubic hairs of MARIO MARQUEZ, because within a short period of time of showing the bodies of the two deceased women to ROSA GUTIERREZ, MARIO MARQUEZ, sexually assaulted ROSA GUTIERREZ by forcing his penis into her mouth. Also, human spermatozoa were found in the rectum of RACHEL GUTIERREZ, and there were lacertions of her rectum and the perineum between her anus and vagina.

After being arrested on January 27, 1984, MARIO MARQUEZ's person was searched, and he was found to have blood on his undershorts. Affiant believes that this fact is consistent with his having penetrated the anus of RACHEL GUTIERREZ with his penis. For that reason, your affiant requests that a sample of MARIO MARQUEZ's blood be taken, to be tested, in order to eliminate him as the source of the blood on his undershorts.

Also, on the bodies of both deceased females Dr. Dana found human teeth or bite marks to the right nipple and pubic mound of each woman. Your affiant believes these marks to have been made by MARIO MARQUEZ in the course of killing the two women.

On January 27, A.D., 1984, at the time of Dr. Dana's autopsies on the two women, Dr. Bill Baker, a dentist with the Dental diagnostic Sciences Department of the University of Texas Dental School in San Antonio, took [sic] impressions of the bite marks on the two bodies. He then transferred the impressions and is retaining them in his custody for comparison to the bite mark impressions of MARIO MARQUEZ, which your Affiant is requesting. Dr. Baker believes that he can determine by comparing the impressions from the bodies with the known bite mark patterns of MARIO MARQUEZ, whether MARIO MARQUEZ inflicted these bites.

Your Affiant believes the above information to be reliable and credible because all of it came either from peace officers or from individuals with no known criminal record.

\* \* \* \* \* \*

Reviewing the entire affidavit we find the following facts were presented to the issuing magistrate relevant to the taking of appellant's blood sample.

1. Rachel Gutierrez and Rebecca Marquez were each murdered by ligature strangulation on January 27, 1984.

2. Appellant was under indictment for each murder.

3. Appellant was seen at the residence at the time the bodies were found.

4. Appellant admitted to Rosa Gutierrez that he killed the two women at her residence.

5. Appellant's fingerprints were found in the room when the bodies were found.

6. Autopsies of the deceased women revealed that ten short black hairs were found in the mouth of Rachel Gutierrez.

7. Human spermatozoa was found in the rectum of Rachel Gutierrez.

8. Rachel Gutierrez had several lacerations surrounding her anus and perineum.

9. After being arrested blood was found on appellant's clothing.

Additionally, affiant stated that he believed that the blood found on appellant's clothing was consistent with his having penetrated the anus of the deceased and that he desired the blood sample in order to determine whether the blood found on appellant's clothing was his or that of the deceased.

■ The allegations made in the affidavit are more than sufficient to show that the evidence to be seized constituted evidence of the offense.

Turning to appellant's constitutional claim we again find no merit. Initially, we point out that, because the affidavit in the instant case is sufficient to establish probable cause whether analyzed under the old two-pronged test established by *Aguilar v. Texas,* supra, and *United States v. Spinelli,* supra, or the "totality of the circumstances" test established by *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), we need not decide whether the "totality" test will now be used under the Texas Constitution. Since this State has always used the stricter *Aguilar-Spinelli* test for analyzing probable cause under Article I, Section 9 of the Texas Constitution we will review the in-

stant affidavit using this approach. We note that, because the old two-pronged test requires a stricter showing to establish probable cause, should the affidavit be found sufficient under this test, it will necessarily be found sufficient under the "totality" test.

■ Appellant first argues that the affidavit does not show sufficient information supporting the reliability or credibility of the informants. The affidavit reads in relevant part, "your Affiant believes the above information to be reliable and credible because all of it comes either from peace officers or from individuals with no known criminal record." Appellant alleges that the affidavit must contain some facts to show that the peace officers and other witnesses who provided affiant with the substantive information contained in the affidavit are credible. This argument is entirely without merit. While it is true that such facts must be included when the information contained in the affidavit is given by a confidential informant, as a matter of constitutional law an ordinary citizen as a witness in a case or a police officer is presumed to be reliable and no special showings are required. See *Jaben v. United States,* 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965); *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Flynn,* 664 F.2d 1296 (5th Cir.1982); *Gish v. State,* 606 S.W.2d 883 (Tex.Cr.App.1980); *Kolbert v. State,* 644 S.W.2d 150 (Tex.App. —Dallas 1982, no pet.). Additionally, the affidavit states:

> Your affiant has reason to believe and does believe that the evidence to be searched for is in the location to be searched based on the following information from the police and autopsy reports and sworn statements in San Antonio Police Department Case number 84–30374 ...

This language indicates that at least some of the information was gathered by the affiant himself through examination of sworn statements and autopsy reports. This also bears on the credibility of the information contained in the affidavit.

Appellant also argues that the affidavit provides no underlying circumstances to show how the informants concluded that the items to be seized constituted evidence of the offense. We have already shown that the affidavits contained abundant information linking the items to be seized with evidence of the offense. The affidavit clearly states that appellant was under indictment for the murder of each woman. The deceased in the instant case had sperm in her rectum and lacerations of her anus and perineum. Appellant had blood on his clothing at the time of his arrest.

Based on either test we conclude that probable cause existed to believe that the blood sample to be taken from appellant constituted evidence of the offense involved. Accordingly, the taking of appellant's blood sample and its subsequent admission into evidence did not violate appellant's constitutional or statutory rights. See *Mulder v. State*, 707 S.W.2d 908 (Tex. Cr.App.1986).

Turning to appellant's grounds of error concerning the dental casts taken of appellant's teeth we likewise find no constitutional or statutory violation occurred.

■ In *Patterson v. State*, 509 S.W.2d 857 (Tex.Cr.App.1974), this Court held that there was no constitutional impediment, either as a search and seizure or concerning the privilege against self incrimination, preventing the taking of dental impressions from a criminal defendant. The Court in *Patterson*, supra, likened dental casts to fingerprints for constitutional purposes. We hold this type of relatively unintrusive identification evidence to be seizable without constitutional implication.[4] Appellant's

eleventh, twelfth, thirteenth, fourteenth and fifteenth grounds of error are overruled.

In grounds of error numbers sixteen through twenty appellant complains of the warrantless seizure of his clothing shortly after his arrest on January 27, 1984.

The record reflects that appellant was arrested at approximately 8:00 a.m. and immediately transported to the police station. Appellant was taken to the homocide office where Detective Michalec of the San Antonio Police Department had the appellant disrobe, having noticed blood stains on his clothing. Appellant was given a jail uniform to wear. Among the items of clothing taken from appellant and subsequently introduced into evidence over objection were a T-shirt, underwear, blue jeans and a pair of tennis shoes. Appellant contends that the police lacked probable cause or exigent circumstances to justify the warrantless seizure of appellant's clothing.

■ The warrantless seizure of a suspect's clothing subsequent to a legal arrest, while in custody or detention, is permissible. See *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *Russell v. State*, 665 S.W.2d 771, (Tex.Cr.App.1983); *Stewart v. State*, 611 S.W.2d 434 (Tex.Cr.App.1981); *Deal v. State*, 508 S.W.2d 355 (Tex.Cr.App.1974). Appellant's sixteenth, seventeenth, eighteenth, nineteenth and twentieth grounds of error are overruled.

In ground of error number ten appellant argues that it was error for the trial court to overrule his motion to set aside the indictment because the caption to House

---

**4.** In any case, an analysis of the affidavit under the Fourth Amendment and Article I, Section 9 along with Texas statutory provisions yields similar results as that of the blood sample. The affidavit clearly provides ample evidence to show that dental casts constitute evidence of the offense. Concerning the taking of dental casts the affidavit provided the issuing magistrate with the following information.

1) Each of the bodies had human bite marks on the right breast and pubic mound.

2) A dentist took impressions of the bite marks of the victims.

3) The dentist said that he could discover whether appellant made the bite marks found on the victims by comparing the impressions he had taken from the body with a cast of appellant's teeth.

Additionally, affiant stated his belief that the bite marks were made during the course of the murder by appellant and such could be proven by the comparison.

Again, this type of evidence suffices to establish probable cause that the evidence sought constituted evidence of the offense under both Article 18.01(c) and the relevant constitutional provisions.

Bill 200, 63rd Legislature, Regular Session, 1973, concerning the death penalty statute is not specific enough to give a reasonable reader fair notice of the contents of the bill in violation of Art. III, Sec. 35.

Specifically, appellant argues that the caption to House Bill 200 which enacted V.T.C.A. Penal Code, Sec. 19.03(a)(2) and Art. 37.071, V.A.C.C.P., along with other statutes dealing with capital punishment, is a violation of Art. III, Sec. 35 which requires that the subject of a bill be embraced in its title.

■ Notwithstanding the recent constitutional amendment bearing on our power to hold legislation unconstitutional because its caption fails to give fair notice as required under Art. III, § 35 we find appellant's allegation unmeritorious. This court has many times held that the caption to House Bill 200 is sufficient under Art. III, § 35. See *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979); *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr.App.1979); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977); *Brown v. State*, 554 S.W.2d 677 (Tex.Cr.App.1977); *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976).

Appellant urges that none of the cited cases has ever seriously considered his contention and our research has revealed no recent cases concerning the constitutionality of House Bill 200. Therefore, we will address the merits of appellant's claim.

The caption to House Bill 200 reads: An act relating to the punishment for murder under certain circumstances and conditions; amending Article 1257, Penal Code of Texas, 1925; amending Chapter 19, Subchapter C of Chapter 12, and Section 12.04, Penal Code (Senate Bill 34, Regular Session, 63rd Legislature, 1973); amending Articles 1.14, as amended, 1-15, as amended, 35.17, 40.03, and Subsection (b), Section 2, Article 37.07, as amended, Section 1, Article 26.05, as amended, and Subsection (b), Article 35.-15, Code of Criminal Procedure, 1965, and adding Article 37.071; and declaring an emergency.

Appellant argues that the caption at issue here is even less informative than that in *Ex Parte Crisp*, 661 S.W.2d 944 (Tex.Cr. App.1983). The caption in *Crisp*, supra, reads:

An act relating to offenses and penalties under the Texas Controlled Substances Act.

This Court held the bill unconstitutional because it created the new offense of "aggravated" possession of marihuana, added the new sections to the Controlled Substances Act and repealed one section. Moreover, and perhaps most importantly, several statutes found in the Code of Criminal Procedures and Penal Code were implicitly changed. None of these events were adequately described in the bill's caption.

The caption to House Bill 200 does not suffer from the same deficiency. The added or amended sections are specifically described and there is no showing that sections found in other, unnamed codes were charged. Appellant seems to want much more specificity. However, we fail to see how this can be done without including the entire contents of the bill in its caption. Appellant's tenth ground of error is overruled. See also *Baggett v. State*, 722 S.W.2d 700 (Tex.Cr.App.1987).

In ground of error number twenty-one appellant complains that the trial court erred in overruling his motion to set aside the indictment because it failed to allege facts crucial to the preparation of appellant's defense.

The indictment reads in pertinent part that appellant did,

intentionally cause the death of an individual, namely: RACHEL GUTIERREZ, hereinafter called complainant, by strangling the said complainant while in the course of committing and attempting to commit the offense of AGGRAVATED SEXUAL ASSAULT upon RACHEL GUTIERREZ; ...

Specifically, appellant argues that the indictment was defective for not specifying which type of aggravated sexual assault he allegedly committed, for not alleging culpable mental state in connection with the underlying offense of aggravated sexual assault and for not alleging the manner

and means by which the aggravated sexual assault was allegedly committed.

It is well established that the constituent elements of the offense constituting the aggravating feature of a capital murder charge need not be alleged in the indictment. This is so even in the face of a motion to quash. See *Andrade v. State*, 700 S.W.2d 585 (Tex.Cr.App.1985); *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr.App. 1979); *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976), cert. denied, 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977). Appellant's twenty-first ground of error is overruled.

In ground of error number six appellant claims that his voir doir of venireperson Porfirio Perez was impermissibly limited.

During the course of examining Perez the State's attorney questioned him concerning his attitude toward direct and circumstantial evidence in a capital murder case. Perez revealed that he would require the State to produce an eye-witness before he could render a guilty verdict.

Q. ... I'm asking you, if you believed from the evidence that a person was guilty of capital murder based solely on circumstantial testimony—no one actually saw him do it, but you believed it beyond a reasonable doubt, would you return a guilty verdict?

A. No, sir.

Q. You would require the State to produce an eyewitness.

A. Yes.

Q. You could never in any circumstances base a guilty verdict in a capital murder trial unless there is eyewitness testimony, is that what you are saying?

A. Right.

Appellant's counsel was then allowed to examine Perez. Perez equivocated, indicating that he would have to hear the evidence first, that he could keep an open mind, and that he understood that legally circumstantial evidence carried the same weight as direct.

Q. Okay. Do you feel like you could keep an open mind and listen to whatever evidence the State had, whether they call it eyewitness evidence or circumstantial evidence?

A. Right.

Q. Do you feel like if—even if it was circumstantial evidence that if it was strong enough you could base a verdict of either guilty or not guilty depending on whether you believe it beyond a reasonable doubt?

A. Right.

Perez was again questioned by the State and again he stated that an eyewitness would have to be produced before he could consider a guilty verdict in a capital case. Perez equivocated in response to a question of the trial court stating in response to the question whether he could convict on the basis of circumstantial evidence, "Yes, I guess I could."

The State again questioned Perez and he again stated his belief that an eyewitness was necessary.

Q. And what we're trying to determine is which type you are, whether you could base a decision in a capital murder case where a person's life is at stake on circumstantial evidence if you believed it beyond a reasonable doubt?

A. Okay. It would have to be an eyewitness.

THE COURT: It would have to be an eyewitness.

THE WITNESS: Yes, sir.

Perez was then again questioned by appellant's counsel concerning a hypothetical situation wherein Perez walked outside the building and saw that the sidewalks and streets were wet. Appellant's counsel asked him whether he could conclude that it had rained even though he did not see it.

MR. STEVENS: ... Could you base a decision about the rain on circumstantial evidence that was proved to you beyond a reasonable doubt? You had no reasonable doubt in your mind that it had rained in that case, right?

THE WITNESS: Right.

Q. So you can visualize a situation in which circumstantial evidence might be overwhelming, is that right?

A. Right.

Q. Now, I don't know what the evidence is going to be in this case, but you are just telling us right now that you can visualize a case in which circumstantial evidence might convince you of something beyond a reasonable doubt, is that right?

A. Right.

Then, the following occurred when Perez was questioned by appellant's counsel in conjunction with the trial judge.

Q. And if the case was strong enough, whatever the case might be—I'm not going to pin you down to certain facts. I'm just saying you can see a fact situation, a set of facts which might be strong enough to base a verdict of guilty beyond a reasonable doubt on it in your mind, can't you?

A. Yes.

Q. And you are not saying that necessarily these would have to be an eyewitness of the facts—if the circumstances alone were strong enough, are you?

A. Yes.

Q. You didn't see it rain.

THE COURT: Let him answer it.

THE WITNESS: Yes.

THE COURT: Wait a minute. Let him answer that question. Wait a minute. Read the question back.

(Whereupon, the reporter read back the following: 'And you are not saying that necessarily there would have to be an eyewitness if the facts—if the circumstances alone were strong enough, are you?)

THE WITNESS: Yes.

THE COURT: Yes what?

THE WITNESS: Yes.

THE COURT: Yes. You are saying yes, there would have to be an eyewitness or no, there would not have to be an eyewitness?

THE WITNESS: Well, like I said—

THE COURT: Wait a minute. Read the question back again.

(Whereupon, the reporter read back the following: 'And you are not saying

that necessarily there would have to be an eyewitness if the witness—if the circumstances alone were strong enough, are you?')

THE COURT: Now, answer this question yes, there must be an eyewitness or no, there may not—there does not have to be.

MR. SPINNER: I'm going to object to the question because he has never gone into asking him what we've (sic) concerned with. *Is he going to require an eyewitness in a capital murder case. I don't care about any other case. I'm talking about capital murder.*

THE COURT: All right. I'll ask the question myself. I'm not going to turn him back over to either of you because he's already—whichever way he answers it, well, I'm going to rule on it that way. Is that satisfactory to everybody? I don't want to rehash this forever.

MR. STEVENS: Your honor, I respectfully cannot answer the Court's question until I've heard the question.

THE COURT: All right. In a capital murder case where there is the possibility of a death penalty, could you vote guilty if the State proved the case beyond a reasonable doubt by circumstantial evidence or would you require an eyewitness to the murder.

THE WITNESS: I think an eyewitness to the murder.

THE COURT: You would require an eyewitness to the murder?

THE WITNESS: Yes.

THE COURT: All right.

MR. SPINNER: I challenge for cause.

MR. STEVENS: Your Honor, we would like to ask more questions.

THE COURT: You will be excused.

Appellant argues that it was reversible error to deny him the opportunity to question Perez further about his perception of the difference between direct and circumstantial evidence. To support his position appellant cites *Perillo v. State*, 656 S.W.2d 739 (Tex.Cr.App.1982). Examination of

these cases, however, reveals them to be clearly distinguishable.

In *Perillo,* supra, the defendant was not allowed to examine the prospective juror at all. The Court held that such was error under Art. 35.17, V.A.C.C.P., which specifically allows the State or defense counsel to examine any prospective juror on demand. In determining whether such error was harmful the Court held that the following test be applied,

> Whether, at the time the State makes its challenge for cause, or at the time the trial judge grants or sustains the State's challenge for cause, the prospective juror has been shown to be absolutely disqualified under *Adams v. Texas,* [448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)] and *Witherspoon v. Illinois,* [391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)], ...?

*Perillo,* supra at 81.

Similarly, in *Rougeau,* supra, defense counsel was effectively prevented from examining the prospective juror at all. The Court held that the error resulting was harmful since the juror was not absolutely disqualified under *Witherspoon,* supra.

■■■ In the instant case appellant was not prevented from examining Perez completely concerning the area of law at issue. Indeed, the trial judge allowed appellant to question Perez on two separate occasions. After examination by both attorneys and the court Perez stated he would require eyewitness testimony. He was thus excludable under Art. 35.16(b)(3), in that he had a bias or prejudice against an aspect of the law upon which the State was entitled to rely. A trial court is empowered to impose reasonable restrictions on the conduct of voir dire. The exercise of that power is within the sound discretion of the trial judge. See *Easterling v. State,* 710 S.W.2d 569 (Tex.Cr.App.1986); *Phillips v. State,* 701 S.W.2d 875 (Tex.Cr.App.1985); *Brooks v. State,* 599 S.W.2d 312 (Tex.Cr. App.1979); *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978). Appellant has not alleged that the trial judge abused his discretion in not allowing him a third opportunity to question Perez on the differences between direct and circumstantial evidence. After carefully examining the record we also find no abuse of discretion. Appellant's sixth ground of error is overruled.

In ground of error number twenty-two appellant argues that the State should have been required to elect whether it was seeking to convict appellant of murder during the course of committing aggravated sexual assault *or* during attempting to commit aggravated sexual assault.

The charge reads in pertinent part:

Therefore, if you find from the evidence beyond a reasonable doubt that the defendant, Mario Marquez, did, in Bexar County, Texas, on or about the 27th day of January, A.D., 1984, intentionally cause the death of an individual, namely, Rachel Gutierrez, by strangling the said Rachel Gutierrez with a ligature, and the said Mario Marquez did then and there intentionally cause the death of the said Rachel Gutierrez while in the course of committing or attempting to commit the offense of aggravated sexual assault upon Rachel Gutierrez, you will find the defendant guilty of capital murder.

Appellant objected to the wording of the charge and sought to have the State elect, prior to giving the charge to the jury, whether it was going to rely on attempted aggravated sexual assault or actual aggravated sexual assault as the underlying offense to the capital murder charge. The State opposed this and the trial court overruled appellant's objection.

Appellant urges that the rule explained in *Vasquez v. State,* 665 S.W.2d 484 (Tex. Cr.App.1984), mandates that the instant case be reversed. In *Vasquez,* supra, the defendant was charged with arson under V.T.C.A., Penal Code, § 28.02. The indictment alleged in pertinent part that the defendant did "intentionally and knowingly start a fire and cause an explosion with intent to damage and destroy a habitation, knowing said habitation was within the limits of an incorporated city and town, to-wit, Three Rivers, Texas, and knowing that said habitation was located on property belonging to another, to-wit, Freddie Diaz." The jury was subsequently charged that it

could convict the defendant if it found either that the defendant knew the habitation was within the incorporated city or that it belonged to another.

The defendant challenged the sufficiency of the evidence because no evidence was introduced to show that Three Rivers was an incorporated city or town. This Court held that while the evidence was insufficient to show Three Rivers was an incorporated town there was sufficient evidence to show that the habitation burned was that of another. The Court reasoned:

> It is proper for an indictment to allege different ways of committing the offense in the conjunctive and for the jury to be charged disjunctively. [citations omitted] Proof of either is sufficient, *Pinkerton v. State*, 660 S.W.2d 58 (Tex.Cr. App.1983); *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980); *Boyd v. State*, 419 S.W.2d 843 (Tex.Cr.App.1967); *Papes v. State*, 494 S.W.2d 910 (Tex.Cr. App.1973), absent an objection to the charge based on insufficient evidence, *Savant v. State*, 544 S.W.2d 408 (Tex.Cr. App.1977) or a motion to force the State to elect, *Espinoza v. State*, 638 S.W.2d 479 (Tex.Cr.App.1982).

*Vasquez*, supra, at 486–487.

Thus, the Court held that since the evidence was sufficient to prove one of the two ways of committing the offense and no motion to compel election was made the defendant's contention was overruled. *Vasquez*, supra, at 487.

The issue in *Vasquez*, supra was the sufficiency of the evidence. No motion to force the State to elect was made. Therefore, the issue of election and its ramifications was not before the Court in that case. The language in *Vasquez*, supra, seeming to require election in such cases is dicta. It cites *Espinoza v. State*, 638 S.W.2d 479 (Tex.Cr.App.1982) as authority for the proposition that a defendant charged under an indictment containing two different means of committing the same offense can force the State to elect between the means prior to submitting the case the jury. That may be so, although the issue was not presented in *Vasquez*, supra, and *Espino-*

*za*, supra, does not support that contention. In *Espinoza*, supra, the defendant burglarized the same building on April 8, 1977 and on April 10, 1977. The indictment alleged that the defendant burglarized the building "on or about" April 9, 1977. The issue in the case was whether the State could rely on the general rule that they are not bound by the date alleged in the indictment so long as the evidence shows that the offense was committed anytime prior to the return of the indictment and within the statute of limitations. The Court concluded that the State was entitled to rely on the general rule. While the defendant in *Espinoza*, supra, made no motion to force election, the Court did note the possible double jeopardy problems involved in a case where evidence of separate offenses is admitted under an indictment upon which a conviction of either offense is permitted. The Court quoted *Marshall v. State*, 432 S.W.2d 918, 919 (Tex.Cr.App.1968),

> "Where two or more similar but separate acts constituting separate offenses are placed in evidence under an indictment or information under which a conviction of either offense can be had, and neither the state nor the court elects one particular act on which conviction is sought, a plea of former conviction or of former acquittal will be good on a subsequent prosecution based on any of the acts or offenses proved, it being uncertain for which one the conviction was had."

*Espinoza*, supra at 480 n. 1.

The cases relied upon by appellant in the instant case to require the State to elect are inapplicable. Both *Espinoza*, supra, and *Marshall*, supra, involved the situation where the State pleads two similar but entirely separate acts, both of which constitute similar but separate offenses. See also *Crawford v. State*, 696 S.W.2d 903 (Tex.Cr.App.1985); *Hill v. State*, 544 S.W.2d 411 (Tex.Cr.App.1976). In *Vasquez*, supra, a sufficiency case, the State pleaded two different means of committing the offense of arson, both of which are specifically enumerated in the statute as alternate ways of committing the offense. See V.T.C.A., Penal Code, Section 28.02.

In the instant case the State has not pleaded two separate underlying offenses or even two different means for committing the same offense. Rather, in the context of the capital murder statute, "in the course of committing or attempting to commit" constitutes a single element of capital murder. V.T.C.A., Penal Code, Section 19.03 reads in pertinent part,

> (a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:
>
> (2) the person intentionally commits the murder *in the course of committing or attempting to commit* kidnapping burglary, robbery, aggravated sexual assault, or arson; (emphasis added)

The specific words of the statute, "committing or attempting to commit" an offense alleges one underlying offense. A motion to force election in the instant case would have done appellant no good. It simply does not matter whether or not the underlying offense of aggravated sexual assault was completed rather than attempted. Proof of attempt or proof of commission of the underlying offense meets the statute. A motion to force election as to "attempt" or "commission" is meaningless because there is no distinction between the two in the context of the capital murder statute. They are not different means of committing the same offense and they are not similar but separate offenses. As long as appellant's actions amounted to attempted aggravated sexual assault the underlying offense pleaded by the State has been proven. Appellant's twenty-second ground of error is overruled.

In ground of error number nine appellant claims it was error for the trial court to instruct the jury to continue deliberations after it indicated a deadlock at the punishment phase of trial.

The docket sheet reflects that the jury retired to deliberate on the punishment of appellant at 11:09 a.m. There was a recess from 12:00 noon until 1:10 p.m. At 2:45 p.m. the jury sent a note to the judge indicating that they were deadlocked.[5] The jury was returned to the courtroom at 3:00 p.m. and instructed to continue with their deliberations. At 3:40 p.m. the jury informed the court that it had reached a verdict.

Appellant contends that the court's instruction to the jury to continue deliberations was coercive, and denied appellant the right to effective assistance of counsel, due process and equal protection under the laws, and a fair and impartial jury, guaranteed by the United States and Texas Constitutions. We do not agree.

In *De Luna v. State*, 711 S.W.2d 44 (Tex.Cr.App.1986), this court held that the length of time the jury deliberates rests on the sound discretion of the trial court, and absent an abuse of that discretion there is no error. See *Garcia v. State*, 522 S.W.2d 203 (Tex.Cr.App.1975).

Similarly, in *Andrade v. State*, 700 S.W.2d 585 (Tex.Cr.App.1985), the jury began deliberations on the special issues at 12:00 noon. The jury indicated that it was deadlocked after only four and one-half hours. The trial court instructed the jury to continue deliberations. At 7:30 p.m. in response to the court's question "... do you think you are making any progress ...?", the jury foreman responded "very little, but possibly" and replied, "It's possible" to the question, "do you think there is any hope of reaching a verdict?" The jury retired at 11:00 p.m. and resumed the next morning at 9:00 a.m. At 9:27 a.m. a unanimous verdict was reached. The defendant argued that the court's instruction to continue deliberations was an abuse of discretion. We held that the length of time a jury may be held for deliberation rests in the sound discretion of the court and considering the nature of the case, a capital murder, and the time of deliberation, approximately twelve hours, no abuse of discretion was shown. See *Jones v. State*, 148 Tex.Cr.R. 374, 187 S.W.2d 400 (Tex.Cr. App.1945).

---

5. The note sent out by the jury reads:
The jury has reached a deadlock. What action is to be taken next.

■ The instant case is also a capital murder. The jury sent its note indicating deadlock after only two hours and twenty-five minutes of deliberation. After being instructed to continue, the jury deliberated for an additional 40 minutes. The entire length of deliberation on punishment totaled three hours and twenty minutes. Due to the serious nature of the case and the relatively short period of deliberation, we cannot say the trial judge's instruction was an abuse of discretion. Appellant's ninth ground of error is overruled.

In grounds of error twenty-three and twenty-four appellant complains that it was error for the trial court to refuse to define "proof beyond a reasonable doubt" at both the guilt/innocence and punishment phase of trial.

This Court has often held that "proof beyond a reasonable doubt" need not be defined even if a request for such definition is made. See *Massey v. State*, 1 Tex. App. 563 (1877); *Fury v. State*, 8 Tex.App. 471 (1880); *McPhail v. State*, 9 Tex.App. 164 (1880); *Cohea v. State*, 9 Tex.App. 173 (1880); *Schultz v. State*, 20 Tex.App. 315 (1886); *Johnson v. State*, 27 Tex.App. 163, 11 S.W. 106 (1889); *Lenert v. State*, 63 S.W. 563 (Tex.Cr.App.1901); *Holmes v. State*, 68 Tex.Cr.R. 17, 150 S.W. 926 (Tex. Cr.App.1912); *Sanchez v. State*, 69 Tex. Cr.R. 1134, 153 S.W. 1133 (Tex.Cr.App. 1913); *Marshall v. State*, 76 Tex.Cr.R. 386, 175 S.W. 154 (Tex.Cr.App.1915); *Bennett v. State*, 91 Tex.Cr.R. 422, 239 S.W. 951 (Tex.Cr.App.1922); *Sage v. State*, 94 Tex. Cr.R. 14, 248 S.W. 390 (Tex.Cr.App.1923); *Gallegos v. State*, 152 Tex.Cr.R. 508, 215 S.W.2d 344 (Tex.Cr.App.1948); *Pierce v. State*, 159 Tex.Cr.R. 504, 265 S.W.2d 601 (Tex.Cr.App.1954); *Pigg v. State*, 162 Tex. Cr.R. 521, 287 S.W.2d 673 (Tex.Cr.App. 1956). Cf. *Whitson v. State*, 495 S.W.2d 944 (Tex.Cr.App.1973). Accordingly, appellant's twenty-third and twenty-fourth grounds of error are overruled.

In grounds of error twenty-five and twenty-six appellant argues that the practice of allowing a single jury to hear evidence and return verdicts at both the guilt/innocence and punishment phases of trial deprived him of his right to a jury made up of a fair cross-section of the community in violation of Art. I, § 10 of the Texas Constitution.

Appellant acknowledges that this argument was expressly rejected as a matter of federal constitutional law in *Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). However, appellant contends that the Texas Constitution provides a criminal defendant with greater protection. Appellant argues that either separate juries should have been selected to hear each phase of the trial or that sufficient alternate jurors should have been selected at the outset of the trial to replace those jurors who held conscientious objections to the imposition of the death penalty but were capable of making a determination on guilt.[6] Both of these solutions were suggested by the Eighth Circuit Court of Appeals in *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir.1985).[7]

In *Grigsby*, supra, the Eighth Circuit Court of Appeals held that a capital jury in which all "*Witherspoon*-excludables" have been removed for cause was conviction-prone and therefore denied a defendant his constitutional right to an impartial jury made up of a fair cross-section of the community. The Court concluded that,

The exclusion of jurors who will never consider a penalty of death, approved in *Witherspoon*, becomes irrelevant when the focus is on the first half of a bifurcated trial; on the guilt-innocence phase, rather than the penalty determination. *Witherspoon* does not hold that jurors unalterably opposed to the death penalty, but who nonetheless can swear to consider the evidence and follow the law in determining guilt, can be excluded from

6. In *Lockhart,* supra, these jurors are referred to as "*Witherspoon*-excludables."

7. *Lockhart,* supra, was litigated in the lower courts as *Grigsby v. Mabry*, 569 F.Supp. 1273 (E.D.Ark.1983), aff'd. 758 F.2d 226 (8th Cir. 1985).

the guilt-innocence phase of a bifurcated trial.

*Grigsby,* supra, 758 F.2d at 232.

Based on attitudinal, demographic and conviction-proneness surveys the circuit court determined: that the group of "*Witherspoon*-excludables" constituted a "distinctive" group for fair cross-section purposes; that representatives from this group were not included on capital juries in a fair and reasonable relation to the number of such persons in the community; and that this underrepresentation was due to the systematic exclusion of the group in the jury selection process. See *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 64, 58 L.Ed.2d 579 (1979).

In order to solve this problem the circuit court suggested several possible remedies: a bifurcated trial with two separate juries; selection of enough alternate jurors at the outset to replace the "*Witherspoon*-excludables" at the penalty phase; shifting the sentencing duty to the trial judge; or using an advisory jury at the penalty phase which need not be unanimous in its recommendation. *Grigsby,* supra, 758 F.2d 242–243.

In *Lockhart,* supra, the United States Supreme Court overruled the Court of Appeals holding that there was no federal constitutional impediment to removing for cause, prior to the guilt phase of a capital trial, prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the penalty phase of trial. *Lockhart,* supra, 106 S.Ct. at 1160.

In *Lockhart,* supra, the Supreme Court initially found that the group of "*Witherspoon*-excludables" was not a "distinctive" group for purposes of the fair cross-section requirement. The Court reasoned,

> The group of '*Witherspoon*-excludables' involved in the case at bar differs significantly from the groups we have previously recognized as 'distinctive.' 'Death

qualification,' unlike the wholesale exclusion of blacks, women or Mexican-Americans from jury service, is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial. There is a very little danger, ..., that 'death qualification' was instituted as a means for the State to arbitrarily skew the composition of capital-case juries.

*Lockhart,* supra., 106 S.Ct. at 1766.

The Court further distinguished "*Witherspoon*-excludables" from other "distinctive" groups by asserting that "death qualification" excludes certain prospective jurors for an attitude that is completely within the individual's control. These jurors are perfectly free to set aside their own beliefs in deference to the rule of law. The other "distinctive" groups are excluded because of traits or characteristics not within their own control. *Lockhart,* supra, 106 S.Ct. at 1766.

Finally, the Supreme Court reasoned that the removal for cause of "*Witherspoon*-excludables" did not disqualify them from serving on juries in other criminal cases. Therefore, there was no substantial deprivation of their basic right of citizenship. *Lockhart,* supra, 106 S.Ct. at 1766.

The Supreme Court concluded that,

> ..., '*Witherspoon*-excludables,' or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objection of the fair cross-section requirement.[8]

*Lockhart,* supra, 106 S.Ct. at 1766.

Appellant concedes that *Lockhart,* supra, is inimical to his argument. However, he

---

8. In *Taylor v. Louisiana,* 419 U.S. 522, 530–531, 95 S.Ct. 692, 697–698, 42 L.Ed.2d 690 (1975), the Supreme Court enumerated the basic objections of the cross-section requirement.

> We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by

the Sixth Amendment and are convinced that the requirement has solid foundation. The purpose of the jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or

regards the protection provided by the Texas Constitution to be of higher magnitude than the federal constitution in this area. While it is by now axiomatic that the federal constitution provides only a minimum standard of protection to be afforded citizens of the several states and the states are free to provide greater protection by constitution or statute, we decline to do so in the instant case for reasons which follow.

The State of Texas has a legitimate interest in obtaining a jury qualified to hear evidence and return verdicts on the entire case. The Legislature has codified the state interest by providing for a unitary jury in capital cases. Of course, there is nothing in the Constitution which would prevent the Legislature from altering the unitary jury system in capital cases but such a sweeping change in Texas Criminal procedure should be left to legislative enactment.

Appellant has submitted no case which suggests that the impartial jury and fair cross-section requirements embodied in the two constitutions are different. And, indeed, we can conceive of no reason why they should be so. We are not without authority in holding that the two constitutional provisions provide comparable protection. See *Olson v. State*, 484 S.W.2d 756 (Tex.Cr.App.1969) (holding that the provision of the Texas Constitution that in criminal prosecutions an accused shall not be compelled to give evidence against himself is comparable in scope to the Fifth Amendment to the United States Constitution which provides that no person shall be compelled in a criminal case to be a witness against himself); *Brown v. State*, 657 S.W.2d 797 (Tex.Cr.App.1983), (holding that Article I, § 9 of the Texas Constitution provides similar protection against unreasonable searches and seizures as that protection embodies in the Fourth amendment to the United States Constitution).

Further, there is no significant textual difference between the two constitutional provisions which would indicate that different standards of protection should be applied.[9]

■ Because we hold that the Texas Constitution provides the same protection as the federal constitution with regard to an impartial jury made up of a fair cross-section of the community, we adopt the reasoning found in *Lockhart*, supra, as the proper analysis under the Texas Constitution. Particularly, we hold that there is no state constitutional impediment to striking for cause, prior to the guilt phase of a capital trial, all prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the penalty phase of trial. Appellant's twenty-fifth and twenty-sixth grounds of error are overruled.

In ground of error number twenty-seven appellant argues that Art. 37.071(b)(1) is unconstitutional and denies him his right to a fair and impartial jury, effective assistance of counsel, equal protection under the law, due process and due course of law and his right to be free from cruel and unusual punishment because the statute fails to properly narrow the class of persons eligible for the death penalty.[10]

mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge ... Community participation in the administration of the criminal law, ... is also critical to public confidence in the fairness of the criminal justice system ...

'... [T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility.' *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227, 66 S.Ct. 984 [989], 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting).

9. The pertinent part of Art. I, § 10 reads,
   In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury.
   The pertinent part of the Sixth Amendment reads:
   In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury....

10. Article 37.071(b)(1) reads:
    (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
    (1) whether the conduct of the defendant that caused the death of the deceased was

Specifically, appellant argues that as a practical matter, a finding of "deliberateness" under special punishment issue number one is invariably made upon a finding of an intentional killing at the guilt/innocence phase. We do not agree.

This Court has repeatedly and resoundingly rejected defendants' claims that "intentional" is synonymous with "deliberate." See *Williams v. State*, 674 S.W.2d 315 (Tex.Cr.App.1984); *Fearance v. State*, 620 S.W.2d 577 (Tex.Cr.App.1981) (on rehearing); *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981).

It should be noted that appellant has argued that in practice the finding of an intentional killing at the guilt phase of a capital case necessarily means that the first special issue will be found in the affirmative. Appellant has shown no evidence that this is generally true and, indeed, it cannot be true in the instant case. In the instant case the charge to the jury on punishment contains the following:

> As used in the first special issue, the word 'deliberately' has a meaning different and distinct from the word 'intentionally' as that word was previously defined in the charge on guilt and; the word 'deliberately' as used in the first special issue means a manner of doing an act characterized by or resulting from careful consideration: 'a conscious decision involving a thought process; conduct which embraces more than mere will to engage in the conduct.'

Thus, notwithstanding this Court's stance on the issue of whether or not the jury should be instructed on the difference between "deliberate" and "intentional", see *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983); *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983); *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985), appellant has no room to complain. Regardless of his belief that generally the terms are understood by juries to have similar meanings, this jury was specifically instructed that they do not. Accordingly, appellant's

committed deliberately and with the reasonable expectation that the death of the de-

twenty-seventh ground of error is overruled.

The judgment is affirmed.

CLINTON, J., concurs in the result.

TEAGUE, J., dissents.

ceased or another would result.