02-10-271&272-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

NOS. 02-10-00271-CR
          02-10-00272-CR

 

 


 
 
 TIMOTHY ERNEST MAY
 
 
  
 
 
 APPELLANT
 
 


 

V.

 


 
 
 THE
 STATE OF TEXAS
 
 
  
 
 
 STATE
 
 


 

 

------------

 

FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I.  Introduction

          In three issues in cause
number 02-10-00271-CR, and in two issues in cause number 02-10-00272-CR, Appellant
Timothy Ernest May appeals his convictions for felony driving while intoxicated
(DWI) and felony evading arrest using a vehicle.  We affirm.

II.  Factual and Procedural
Background

          On June 15, 2009, May drove
off after rear-ending another vehicle and then, after being stopped for an unrelated
incident, drove away instead of exiting the vehicle as requested by the officer
who stopped him.  The officer chased him, and his pursuit ended after May
rolled his vehicle, a white Kia Sorento bearing Texas license plate number NGY
203.[2]

May was charged in cause number CR11479
(appellate cause number 02-10-00271-CR) with committing felony DWI after having
been previously convicted of DWI in 1992 and again in 1996, and he stipulated
to his two prior DWI convictions.  May was charged in cause number CR11362 (appellate
cause number 02-10-00272-CR) with committing evading arrest using a vehicle.  Both
indictments contained an enhancement paragraph and a habitual count, and the
State filed deadly weapon notices in both causes regarding the use of a “white
Kia Sorento bearing Texas license plate number NGY 203.”  May pleaded not
guilty to the charges, but the jury found May guilty of both charges.  The jury
also found in both causes that the white Kia Sorento was a deadly weapon used
during the commission of the offenses.  May pleaded true to the enhancement
paragraph and habitual count in each case, and the jury found these allegations
true and assessed May’s punishment at seventy-five years’ confinement in each
cause. The trial court entered judgment on the verdicts, and these appeals
followed.

III.  Sufficiency of the Evidence

          In his third issue in his
brief in cause number 02-10-00271-CR, May complains that the evidence is not
legally and factually sufficient to support his DWI conviction because the
evidence is insufficient to prove beyond a reasonable doubt that he was
intoxicated at the time he was driving.  In his second issue in his brief in
cause number 02-10-00271-CR and his second issue in his brief in cause number
02-10-00272-CR, he complains that the evidence is legally and factually
insufficient to show that he “used his automobile as a deadly weapon” in,
respectively, the DWI case and in the evading arrest case.[3]

The court of criminal appeals has
overruled Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996), upon
which the factual sufficiency standard of review is based, and decided “that
the Jackson v. Virginia legal-sufficiency standard is the only standard
that a reviewing court should apply in determining whether the evidence is
sufficient to support each element of a criminal offense that the State is required
to prove beyond a reasonable doubt.”  Brooks v. State, 323 S.W.3d 893,
895 (Tex. Crim. App. 2010).  Therefore, we will review May’s sufficiency issues
under Jackson.

A.  Standard of Review

In our due-process review of the
sufficiency of the evidence to support a conviction, we view all of the
evidence in the light most favorable to the prosecution to determine whether
any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99
S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778 (Tex.
Crim. App. 2007).

B.  Evidence

          All of the testimony during
the guilt-innocence phase of trial pertained to the events of June 15, 2009. 
Carlye Underwood testified that she, her two children, and a friend were
stopped at a red light in front of the Majestic Liquor Store in Granbury when a
white Kia Sorento hit her car.  She pulled onto a nearby road, and the Kia
drove past her.  The Kia then returned by driving over the grass and jumping
the curb before stopping perpendicular to her vehicle.  The Kia’s driver, who
Underwood identified as May, rolled down his window, and Underwood asked him
for his insurance card.  May stepped out of his vehicle and never said a word
to Underwood.  Underwood said that when May got out of his vehicle, he stumbled
and put his hand on her car to hold himself up; based on the way he walked and
his driving, she concluded that he was drunk.  Underwood’s friend called 911.[4]

          Underwood testified that
she moved her vehicle into the Majestic parking lot and had expected May to do
the same.  Instead, May returned to his vehicle and then drove through the
Majestic parking lot and back out again, jumping another curb.  Underwood spoke
with Granbury Police Officer Kevin Clapp when he arrived and gave him the Kia’s
license plate number, NGY-203.

Nathan Jernigan saw the incident,
which occurred around 5:00 p.m., stating,

I just happened to look up and saw—saw the accident
happen, saw him slam into the back of the vehicle in front of him.  At first, [I]
didn’t really think anything of it, besides, “Hey, there’s another accident.” 
And the next thing I know, the one—the vehicle who did the—who crashed into the
rear of the other vehicle just kept going straight and took off, veered to the
side of him towards the median in the road and just kept on driving.

Then Jernigan saw the same white car
jump the median and stop on the road, right next to the liquor store.  Jernigan
continued, stating,

Well, when he came back, I just thought, “Hey, he—he
wised up, he came back.”  And—and then I was fixing to go into the store, and
he started rolling down his window, and he had rolled it down, and you see him,
he was just in there, you could tell there was something wrong, because
he—he—he wasn’t—to me, it just wasn’t—my opinion, he just wasn’t normal.  He—he
was just swaying back and forth in that vehicle.

Based on what he had seen, Jernigan
believed the driver of the white vehicle was intoxicated.  During
cross-examination, Jernigan admitted that he did not know May, so he did not
know what May looked like normally.

Department of Public Safety (DPS)
State Trooper Nick Duecker testified that he was heading west on Old Granbury
Road, a narrow two-lane road, when he saw a white Kia Sorento heading east.  The
Kia edged into his side of the road and almost hit him head-on, but the Kia’s driver
did not appear to notice the trooper’s vehicle.  Trooper Duecker testified,
“[W]hen he went by, he didn’t even acknowledge . . . that I was there.”  Trooper
Duecker turned his vehicle around and activated his overhead lights, which turned
on the vehicle’s dashboard camera.

          Trooper Duecker testified
that it took close to half a mile for the Kia to stop after he activated his
vehicle’s lights and then described his initial encounter with May:

As I walked up, the—the passenger side window was up,
and—and I observed the driver fumbling around in his wallet, which I was
assuming he was looking for his driver’s license. I—I  knocked on the window, and
he—he acted startled at first, acknowledged me, and ended up rolling down the
window. . . .  I explained to the—to the driver why he had been stopped, and,
again, he didn’t even acknowledge like he had even done anything wrong, like he
didn’t know what I was talking about. I asked him for his driver’s license and
proof of insurance on the car, and it—it took him—it took him a long time in
order to get his driver’s license. I could see it sitting there. He—he went
past it several times in his—in his wallet, like he didn’t exactly know what he
was looking for.

Trooper Duecker stated that he asked
May where he was going and that May said he was coming from Fort Worth and heading
to his home at 3939 Country Meadows.  Trooper Duecker noticed that May had
severely slurred speech, to the point that the trooper almost could not
understand him, and that there was a strong chemical smell coming from inside
May’s vehicle.  May’s vehicle contained several cleaning supplies, and the
trooper noted that May “was acting almost like he was . . . high from those
chemicals.”  Trooper Duecker stated that he knew at that point that May was
under the influence of something, because his behavior was consistent with
intoxication, but he was not sure about the type of intoxicant.

          When Trooper Duecker walked
around to the front of the Kia, he noticed that the front end was smashed in.  May
told the trooper that he had hit a deer in Granbury thirty minutes before.  While
standing next to May’s driver side window, the trooper asked May if he had been
drinking.  May said, “Yes,” and, when asked how much, May said that he had had
one drink.  The trooper said that at this point, he could smell alcohol on
May’s breath.

          Trooper Duecker returned to
his vehicle, ran May’s driver’s license and license plates, and called for
back-up.  When Officer Kevin Clapp arrived, he told Trooper Duecker that he had
been looking for the Kia because it had been involved in a crash in Granbury.  After
conferring with Officer Clapp, Trooper Duecker returned to May’s vehicle.  When
Trooper Duecker tried to get May out of the vehicle for sobriety tests, May
gave him a blank stare and then slammed the Kia into drive and took off.  Trooper
Duecker ran back to his vehicle, turned on his siren, and pursued May.

The trial court admitted Trooper
Duecker’s dashboard camera DVD, which was published to the jury.  The DVD clearly
shows May careening back and forth across the road as he flees from the trooper,
spinning out into a ditch before continuing to flee, dipping into ditches as he
drives, slamming into a large trash can on the roadside, and, while driving on
the wrong side of the road, just barely missing hitting a vehicle head-on.  The
DVD then shows May driving through a stop sign and continuing to swerve back
and forth across the road and to drive on the wrong side of the road before
finally spinning out and rolling his vehicle all the way over, crumpling the
roof and shattering the windshield.  As corroborated by the DVD, Trooper
Duecker testified that during the pursuit, May drove on the wrong side of the
road more than once and that May traveled in a head-on direction towards an
oncoming vehicle, as he had previously done before the traffic stop.

Trooper Duecker testified that a
vehicle is dangerous when not operated correctly because it weighs around 4,000
pounds and is capable of causing death or serious bodily injury, stating, “[I]f
it hits you, I mean, it’s a deadly weapon . . . [N]o other way
to look at it.”  Trooper Duecker agreed that the manner in which May used his
vehicle was capable of causing death or serious bodily injury.  He also testified
that May was not in control of his vehicle when he rolled it and that May left
the scene of the accident in an ambulance.  Trooper Duecker testified that,
based on his observations, he concluded that May was intoxicated.

          On cross-examination,
Trooper Duecker acknowledged that the reason May said he was coming from Fort
Worth could have been that May did not want to tip him off about the earlier crash;
that he did not know what May’s normal speech was like or whether May’s normal
pattern of speaking was to slur his words; and that May did not pause and think
about his answer when he told the trooper that the damage to the front of May’s
vehicle was caused by hitting a deer.  The trooper agreed that May’s responses
could be indicative of May’s normal mental capabilities.  Trooper Duecker also
replied, “I guess it could be,” when asked if it were possible that some of the
alcohol he smelled emitting from the vehicle was actually from the cleaning
supplies in May’s car, and he admitted that he did not examine the chemicals or
determine their alcohol concentrations.  The trooper also agreed that May’s fleeing
when he tried to detain May could be either because of a “bonehead decision” by
May or because May was intoxicated.

          Officer Clapp testified
that he had finished investigating the hit-and-run when he heard Trooper
Duecker call for assistance.[5] 
Officer Clapp was less than a mile away from Trooper Duecker’s location, and he
noticed when he arrived that the license plate of the vehicle the trooper had
stopped was the same as the one Underwood had given him.  Officer Clapp
testified that he pursued May when May fled from Trooper Duecker and that he
had to drive around eighty-five miles per hour to keep up.  May “was all over
the road,” swerving into ditches and into oncoming traffic.  Officer Clapp
testified that an automobile is something that can be a deadly weapon, capable
of causing death and serious bodily injury, and that May used the Kia in such a
manner that day.

After May wrecked his vehicle, Officer
Clapp tried to help remove May from his vehicle by opening the door.  When he
did so, May fell to the ground and appeared to be snoring.  Officer Clapp
stated that May’s driving during the pursuit was not that of a normal person
and that, based on the driving and May’s appearance after the pursuit ended, he
concluded that May was intoxicated. However, he admitted that he did not smell
alcohol on May or smell alcohol coming from the vehicle.

Jody Alvey, a Hood County paramedic,
testified that she provided treatment to May after he rolled his vehicle.  She
and her partner transported May to a trauma center at Harris Methodist Hospital
in Fort Worth around 6:16 p.m.  The trial court admitted May’s medical records
from the hospital as State’s Exhibit 7.  Alvey read from her notes, which were
included in State’s Exhibit 7, as follows, “Patient admitted to EMS crew that
he had been drinking today[,] about six beers and some vodka.”  In the patient
history portion obtained from May regarding his alcohol use, the report
reflects that May said that he drank a case or more per week of twelve-ounce
beers.

The toxicology report on the sample
collected at 7:04 p.m., around forty-five minutes after May’s rollover, recited
“302” under “Tests, alcohol ethyl.”  Lindsay Hatfield, a DPS forensic scientist,
testified that the “302” represented 302 milligrams of alcohol per deciliter of
blood serum.  Hatfield explained the conversion from milligrams per deciliter
of serum to grams per 100 milliliters of whole blood and then converted May’s
302 milligrams per deciliter to a .25 blood alcohol concentration.  Hatfield
explained that to reach a .25 blood alcohol concentration, a 150-pound male
would have to drink roughly twelve drinks in an hour.

Dustra Burrow, a Granbury bail
bonding agent, testified that she wrote the bond for May on the evading arrest and
felony DWI charges.  The trial court took judicial notice that May failed to
appear for trial on May 24, 2010, and that judgments nisi were entered that day.
 Burrow searched for May for around twenty-one days after his failure to appear,
checking at his residence and any other location she thought he might be and
calling his cell phone.  Burrow agreed that she heard May make statements that
indicated to her that he knew he was supposed to turn himself in during the
three weeks following his failure to appear.

George Turner, an investigator for
the Hood County District Attorney’s office, testified that he was asked to help
locate May after May failed to appear for trial on May 24.  He called May’s
friends, May’s preacher, and May’s family members between May 24 and June 8.  May
called Turner on June 8, stating that he was turning himself in because he was
tired of running from the police.  Turner arranged to meet May at his Country
Meadows residence.  May indicated to Turner that he knew that the sheriff’s
office had been looking for him.  Turner transported May to jail.

C.  Intoxication

          In his third issue in cause
number 02-10-00271-CR, May claims that the evidence is insufficient to convict
him of DWI because no one found any beer bottles or cans or liquor bottles in
his car, because no one gave him any sobriety tests, and because Officer Clapp
testified that he did not smell alcohol on May.[6]
May contends that the only evidence that he had been drinking was in the form
of his admission, made during Trooper Duecker’s stop, that he had had one beer.

          A person commits an offense
if he is intoxicated while operating a motor vehicle in a public place.  Tex.
Penal Code Ann. § 49.04(a) (West 2011).  An offense under section 49.04 is a
third degree felony if it is shown on the trial of the offense that the person
has previously been convicted two times of any offense relating to the
operation of a motor vehicle while intoxicated.  Id. § 49.09(b)(2)
(West 2011).  May stipulated to his two prior DWI convictions, and the evidence
recounted above affirmatively supports that he operated a motor vehicle in a
public place.

          “Intoxicated” is defined in
the penal code as “not having the normal use of mental or physical faculties by
reason of the introduction of alcohol . . . or any other substance into the
body” or as “having an alcohol concentration of 0.08 or more.”  Id. §
49.01 (West 2011).  Notwithstanding May’s .25 blood alcohol content level
around two hours after he hit Underwood’s vehicle,[7]
the testimony at trial reflected that Trooper Duecker smelled alcohol on May’s
breath when he spoke with him during the traffic stop, and he noted that May
had severely slurred speech.  Further, the jury saw the trooper’s dashboard
camera videotape showing May’s driving—weaving to and fro across a narrow
two-lane road, driving on the wrong side of the road, and dipping in and out of
ditches before rolling his vehicle.  Jernigan and Underwood also testified
about May’s driving and unusual behavior, and Alvey testified that May admitted
to the EMS crew that he had been drinking.[8]
 Viewing all of the evidence in the light most favorable to the prosecution, we
conclude that the jury could have found that May was intoxicated by not having
the normal use of his mental or physical faculties by reason of the
introduction of alcohol into his body.  See Jackson, 443 U.S. at 319, 99
S. Ct. at 2789; Clayton, 235 S.W.3d at 778.  We overrule May’s third
issue in cause number 02-10-00271-CR.

D.  Deadly Weapon

          In his second issue in both
cause number 02-10-00271-CR and in cause number 02-10-00272-CR, May argues that
the evidence is legally and factually insufficient to prove that he used his
automobile as a deadly weapon in either offense.  In both of his appellate
briefs, May focuses on what he calls the State’s failure to introduce evidence
that his vehicle endangered another motorist when he rolled his vehicle and
that he safely passed a car that was going in the opposite direction and passed
some stopped cars without putting them in actual danger.  He further argues
that he directed no overt acts at anyone and that more than hypothetical danger
must be shown.  That is, May does not address his driving prior to the
inception of his evading arrest actions, and he argues that the “evidence was
such that [he] only wanted to get away.”

A deadly weapon finding is authorized
upon sufficient evidence that a defendant “used or exhibited” a deadly weapon
during the commission of or flight from a felony offense.  Drichas v. State,
175 S.W.3d 795, 798 (Tex. Crim. App. 2005).  A deadly weapon is “anything that
in the manner of its use or intended use is capable of causing death or serious
bodily injury.”  Tex. Penal Code Ann. § 1.07(a)(17)(B) (West 2011).  A motor
vehicle may become a deadly weapon if the manner of its use is capable of
causing death or serious bodily injury, and specific intent to use a motor
vehicle as a deadly weapon is not required.  Drichas, 175 S.W.3d at 798.

To determine whether the evidence
supports a deadly weapon finding in cases involving motor vehicles, we conduct
a two-part analysis by (1) evaluating the manner in which the defendant used
the motor vehicle during the felony and (2) considering whether, during the
felony, the motor vehicle was capable of causing death or serious bodily
injury.  Hilburn v. State, 312 S.W.3d 169, 177 (Tex. App.—Fort Worth
2010, no pet.) (citing Sierra v. State, 280 S.W.3d 250, 255 (Tex. Crim.
App. 2009)).  We consider several factors in determining whether the
defendant’s driving was reckless or dangerous:  intoxication, speeding,
disregard of traffic signs and signals, erratic driving, and failure to control
the vehicle.  Sierra, 280 S.W.3d at 255–56.

The evidence regarding how May drove began
with testimony that May “slammed” into the back of Underwood’s car, which was
stopped at a red light.  May then proceeded to drive over the grass and jump a
curb.  After he briefly exited his vehicle, he returned to his car and drove
off, jumping another curb.  Jernigan described May’s demeanor as not normal and
said that May swayed back and forth inside his vehicle.  Underwood testified
that when May emerged from his vehicle, he stumbled and had to put his hand on
her car to hold himself up—based on the way he walked, his demeanor, and his
driving, she concluded that he was drunk.  And Trooper Duecker testified that
May nearly hit his vehicle head-on, which led the trooper to conduct a traffic
stop.  See Drichas, 175 S.W.3d at 799 (“[A] deadly weapon finding is
appropriate on a sufficient showing of actual danger, such as evidence that
another motorist was on the highway at the same time and place as the defendant
when the defendant drove in a dangerous manner.”).

May then began evading Trooper
Duecker, and Trooper Duecker’s dashboard camera video revealed that May nearly
caused another head-on collision.  Officer Clapp testified that he had to drive
around eighty-five miles per hour on the narrow, two-lane road to keep up with
May while Trooper Duecker pursued him.  The video revealed that May ran a
traffic sign, wove back and forth across the entire road, dipped into ditches,
and drove on the wrong side of the road before he lost control of his vehicle
and rolled it.  Both officers testified that the manner in which May used his
vehicle was capable of causing death or serious bodily injury.

We have already concluded above that
the evidence is legally sufficient to support the jury’s intoxication finding. 
See id.  Viewed in the light most favorable to the prosecution, the jury
could have found beyond a reasonable doubt that May used his vehicle as a
deadly weapon during the commission of the felony DWI and during the commission
of the evading arrest offense.[9]
 See Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235
S.W.3d at 778; see also Drichas, 175 S.W.3d at 798 (stating that the
appellant’s manner of using his vehicle “made it capable of causing death or serious
bodily injury, particularly where appellant drove on the wrong side of the
highway”).  We overrule May’s second issue in cause number 02-10-00271-CR and
his second issue in cause number 02-10-00272-CR.

IV.  Motion for Mistrial

          In his first issue in cause
number 02-10-00271-CR and his first issue in cause number 02-10-00272-CR, May
argues that the trial court erred by denying his motion for mistrial by
allowing his trial to proceed after he was handcuffed and escorted by officers
past the open door of the jury room where the jury waited.

May cites Long v. State, 823
S.W.2d 259, 282 (Tex. Crim. App. 1991), cert. denied, 505 U.S. 1224
(1992), to support his argument.  In Long, the court of criminal appeals
concluded that the trial court abused its discretion when, even though the
defendant was on trial for committing three brutal murders, there was nothing
in the record to support the trial court’s decision to keep him shackled during
voir dire and trial.  Id. at 263–64, 282–83.  However, the court also
concluded that the abuse of discretion was harmless because “[w]hile appellant
was shackled throughout his trial, even while testifying, he fail[ed] to direct
our attention to any place in the record showing that the jury actually saw
the shackles.”  Id. at 283 (emphasis added). 

          May was searched outside
the jury’s presence after both parties made their opening statements.  May’s
counsel then requested permission to voir dire the bailiff:

I have some information I would like to put on the
record before the jury returns. It’s possible—Mr. May was just now detained,
placed in handcuffs and walked past the jury room while the jury was able to
observe him, and it might prejudice my jury, Judge, if that, in fact,
occurred.  I visited with the bailiff and wasn’t much information shared with
me to decide whether that has occurred or not, so if the Court would allow me
to voir dire the bailiff in this case, with all due respect to him, I just need
to answer—ask him a couple of questions. Would that be okay?

The trial court granted permission.

Harold Clemmons, the bailiff,
testified that May was placed in handcuffs inside the courtroom and outside the
jury’s presence by the detention officers from the sheriff’s department and
that the detention officers escorted May out of the courtroom.  Clemmons also testified
that when the jury had adjourned, he pointed them to the jury room.  All twelve
jurors went inside, but he did not seal them inside by shutting the jury room door. 
He explained, however, “[T]hey could not see [May] pass by.  I looked, I
checked to make sure they could not see him.  I never let them be—see him
handcuffed in—the defendant.”  Clemmons said that he stood across from the jury
room and made sure that none of the jurors approached the door.  The door was
not shut before May returned to the courtroom, but May was not in handcuffs
when he returned, escorted by the two detention officers.

          Clara Brooks, one of the
detention officers, testified that Clemmons’s testimony was accurate and that
she handcuffed May’s hands behind his back and then escorted him out.  Brooks
testified that she did not close the jury door as she went out.  Kyle
Pettijohn, the other detention officer, agreed that Brooks’s and Clemmons’s
testimonies were accurate.  Pettijohn testified that he was also behind May
when he and Brooks escorted May out of the courtroom and that he did not shut
the door to the jury room.  May’s counsel then argued:

Your Honor, at this time I—I have no—no more witnesses
to call other than the fact that we would urge the Court—we would move for a
mistrial at this time, because my jury for Mr. May has been prejudiced by the
fact that they observed him in handcuffs, with his arms to his rear, escorted
by officers past the jury room door, and Judge, that does not in any way
indicate a fair trial for Mr. May. That prejudice—prejudices all people’s
opinion, or those 12 who saw him, and, Judge, I just don’t think this trial
could go on.

The trial court denied his motion.

In contrast to Long, the trial
court here did not require May to appear in restraints during voir dire and
trial.[10] 
Cf. Long, 823 S.W.2d at 282–83.  Further, the record does not reveal any
evidence that any juror actually saw May in handcuffs.  See id. at 283; see
also Canales v. State, 98 S.W.3d 690, 697–98 (Tex. Crim. App.) (“Nothing in
the record indicates that the jury ever saw or heard or was otherwise aware
that appellant was wearing shackles.”), cert. denied, 540 U.S. 1051
(2003); Cooks v. State, 844 S.W.2d 697, 723 (Tex. Crim. App. 1992) (“Here,
as in Long, appellant does not direct us to any evidence in the record
that the jury actually observed the shackles.”), cert. denied, 509 U.S.
927 (1993).  Rather, Clemmons testified that he made sure that the jury did not
see May in handcuffs, and no one on the jury testified.  Cf. Clark, 717 S.W.2d at 918–19.  Absent
evidence that the jury actually became aware of May being temporarily in
handcuffs, we conclude that May was not harmed.  See Long, 823 S.W.2d at 283.  Therefore, we overrule May’s first
issue in both cause numbers.

V.  Conclusion

          Having overruled all of
May’s issues, we affirm the trial court’s judgments.

          

                                                                             PER
CURIAM

 

PANEL:  MCCOY, J.;
LIVINGSTON, C.J.; and DAUPHINOT, J.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  July 28, 2011









[1]See
Tex. R. App. P. 47.4.





[2]Because
May challenges the sufficiency of the evidence, we will address the facts in
greater detail below.





[3]In
his brief in cause number 02-10-00272-CR—the appeal of his evading arrest
conviction—May challenges the sufficiency of the evidence to support the deadly
weapon finding but not any elements of the offense.  And based on the evidence
set out below, the jury could have found the elements required to support this
conviction beyond a reasonable doubt.  See Tex. Penal Code Ann. § 38.04
(West 2008) (stating that a person commits an offense if he intentionally flees
from a person he knows is a peace officer attempting to lawfully arrest or
detain him).





[4]The
trial court admitted the 911 call and allowed the recording to be published to
the jury.





[5]Officer
Clapp testified that it was just after 5:00 p.m. when he received the report of
a hit-and-run near the Majestic liquor store.  When he arrived at the scene,
Underwood gave him the Kia’s license plate number, NGY 203.





[6]May
also complains that the evidence is insufficient to convict him of DWI because
the individual who drew his blood did not testify and the chain of custody was
not established between that individual and the DPS chemist who testified about
the blood’s alcohol content.  However, State’s Exhibit 7—the hospital records
containing May’s blood test results—and Hatfield’s testimony regarding the
conversion of the results to his blood alcohol concentration of .25 were
admitted without objection, even though the EMT’s testimony during
cross-examination established that she did not perform the blood draw or the
blood test.  Further, May raised no objections with regard to this chain of
custody or his right of confrontation during trial.  Therefore, May has failed
to preserve this portion of his complaint for our review.  We also note that
even if May had objected and his objection had been overruled, we would still
consider this evidence because we consider all of the evidence admitted at
trial, even improperly admitted evidence, when performing a sufficiency
review.  See Clayton, 235 S.W.3d at 778; Moff v. State, 131
S.W.3d 485, 489–90 (Tex. Crim. App. 2004).





[7]The
trial court did not charge the jury on the blood alcohol content definition of
intoxication.





[8]Additionally,
Burrow and Turner both testified that May failed to appear for his original
trial date, and Turner testified that May told him he was turning himself in
because he was tired of running from the police.  See Clay v. State, 240
S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (“Evidence of flight evinces a
consciousness of guilt.”).





[9]During trial, May’s counsel’s only objection to the
deadly weapon special instruction included in each cause was that the evidence
was not sufficient in either cause to support it.  He did not move to sever the
two causes at trial.  Instead, he focused during his opening statement on
whether May’s “bonehead decisions” rose to the level of reasonable doubt and
stated that the case’s key issue was “Has the government proved intoxication?” 
May does not raise any issue in either appeal regarding whether the offenses
should be treated as two criminal episodes or a single criminal episode. 





[10]May’s
other citations to authority are also inapposite.  See Marquez v.
State, 725 S.W.2d 217, 227–30 (Tex. Crim. App.) (involving a punishment
trial in which the defendant was shackled before the jury), cert. denied,
484 U.S. 872 (1987), overruled on other grounds by Moody v. State, 827
S.W.2d 875, 892 (Tex. Crim. App. 1992); Clark v. State, 717 S.W.2d 910,
918–19 (Tex. Crim. App. 1986) (holding that even when several jurors testified
that they saw appellant in handcuffs outside of the courtroom, there was no
evidence that these jurors discussed this with the jurors who did not see him
in handcuffs or that this influenced or affected the decisions on guilt or
punishment of any of the jurors who saw him in handcuffs), cert. denied,
481 U.S. 1059 (1987); Moore v. State, 535 S.W.2d 357, 357–58 (Tex. Crim.
App. 1976) (stating that on two occasions, in full view of the jury, the
sheriff escorted appellant into the courtroom in handcuffs, and on three other
occasions, jurors saw appellant brought into the courtroom in handcuffs), overruled
on other grounds by Sneed v. State, 670 S.W.2d 262 (Tex. Crim. App. 1984); Gray
v. State, 99 Tex. Crim. 305, 268 S.W. 941, 949 (1924) (op. on reh’g)
(noting that appellant was kept in handcuffs during trial).